**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------x

PHIL NEUMAN,

Plaintiff,

-against -

JOSE GARCIA, TIM MOL, VICTOR HEGGELMAN, PILLO PORTSMOUTH HOLDING COMPANY, LLC, PILLO FINANCIAL CONSULTING CORP., and CARLISLE INVESTMENT GROUP, S.À R.L.,

Defendants.

---------------------------------------------------x

Case No.: 1:20-cv-10723-PKC

**SECOND AMENDED COMPLAINT FOR DAMAGES, DECLARATORY RELIEF AND INJUNCTIVE RELIEF**

Plaintiff PHIL NEUMAN alleges as follows for his first amended complaint against defendants JOSE GARCIA, TIM MOL, VICTOR HEGGELMAN, PILLO PORTSMOUTH HOLDING COMPANY, LLC, PILLO FINANCIAL CONSULTING CORP. and CARLISLE INVESTMENT GROUP, S.À R.L.:

## NATURE OF ACTION

1. This is an action for breach of contract, fraudulent inducement, breach of fiduciary duty, conversion, conspiracy to commit conversion, fraud, conspiracy to commit fraud and fraudulent conveyance arising from agreements between Plaintiff Phil Neuman, on one hand, and Defendant Jose Garcia and/or his company Defendant Pillo Financial Consulting Corp. ("Pillo Financial"), on the other hand.

2. Pursuant to those agreements, which were executed on November 24,

2009 and April 9, 2010, Garcia and/or Pillo Financial sold Neuman a 50% ownership interest in two Luxembourg companies, which Garcia indirectly owned through Pillo Financial:

(i) Carlisle Management Company S.C.A. (the "Company"), a partnership that operates investment funds focused on the market for U.S. life insurance settlements; and

(ii) Defendant Carlisle Investment Group, S.à r.l. (the "General Partner"), a private liability company that manages the investment funds as the Company's General Partner.

3. Garcia represented that registration of Neuman's 50% interest in the General Partner in the shareholders' register of the General Partner, in the trade and companies register of Luxembourg with the Luxembourg competent authorities was unnecessary and should be delayed indefinitely due to tax and regulatory reasons. Garcia proposed instead that he would transfer to Neuman a 50% ownership interest in Pillo Financial, which was the registered owner of 100% of the General Partner, thereby protecting Neuman's 50% beneficial ownership interest in the General Partner.

4. On April 9, 2010, Garcia, Pillo Financial and Neuman executed the Stock Transfer Agreement annexed hereto as Exhibit 1, which provided for the transfer of 50% of the outstanding shares of Pillo Financial to Neuman. The Stock

Transfer Agreement also provides that New York law governs its interpretation and that the parties submit to the exclusive jurisdiction of New York state and federal courts for any disputes arising thereunder. Stock Transfer Agreement (Exhibit 1) at § 5. Pursuant to the agreement, Pillo Financial issued a stock certificate reflecting Neuman's 50% ownership interest, a copy of which is annexed hereto as Exhibit 2.

5. The Stock Transfer Agreement prohibits Pillo Financial from issuing new shares or transferring assets, including its ownership of the General Partner, without Neuman's written consent:

> … no new shares of Pillo [Financial] shall be issued, and no assets or property of Pillo [Financial] including its shares of Carlisle [Investment Group, S.à r.l.] will be transferred, assigned, sold or encumbered without the written consent of both Neuman and Garcia.

Stock Transfer Agreement (Exhibit 1) at § 3.

6. Notwithstanding this express provision and unbeknownst to Neuman, Garcia caused Pillo Financial to liquidate its ownership interest in the General Partner on May 11, 2011. Pillo Financial transferred 12,260 shares, representing an ownership interest of approximately 91%, to Defendant Pillo Portsmouth Holding Company, LLC ("Pillo Portsmouth"), a limited liability company owned exclusively by Garcia. Pillo Financial transferred the remaining 1,240 shares in the General Partner to Defendant Tim Mol. Although Garcia told Neuman that he had transferred

a portion of his ownership interest in the General Partner to Mol, Garcia fraudulently concealed the fact that since May 11, 2011, Garcia has held his ownership interest in the General Partner through Pillo Portsmouth rather than through Pillo Financial. Garcia subsequently caused Pillo Portsmouth to transfer additional ownership interests in the General Partner to Mol, Defendant Victor Heggelman and Carlisle Acquisition Vehicle, LLC ("CAV").

7. Although Garcia told Neuman that he had transferred a portion of Garcia's interest in the General Partner to Mol, Heggelman and CAV, Garcia repeatedly assured Neuman over the years that he was still the beneficial owner of a 50% interest in the General Partner and that interest was secured through Neuman's ownership interest in Pillo Financial, which was the registered owner of at least 70% of the outstanding shares of the General Partner. Garcia, Mol and Heggelman knew that Pillo Financial no longer held any interest in the General Partner and intentionally concealed that fact from Neuman.

8. Between 2010 and 2019, Garcia, Mol, Heggelman and Neuman met several times each year in New York City, Luxembourg, Geneva or other locations to discuss the Company's business. At these meetings, Garcia consistently assured Neuman that his 50% ownership interest in the General Partner was secure through Neuman's ownership of Pillo Financial. After May 11, 2011, however, Garcia knew

that Pillo Financial no longer owned any interest in the General Partner and that his representations to the contrary to Neuman were false.

9. Mol and Heggelman were present at these meetings and observed Garcia telling Neuman that his 50% interest in the General Partner was secure through Neuman's 50% ownership interest in Pillo Financial. Even though they knew Garcia's representations were false, neither Mol nor Heggelman took any action to disclose that fact to Neuman.

10. At these meetings, Garcia, Mol and Heggelman also consistently represented that because the General Partner managed the Company's investment funds in return for compensation roughly equal to costs, the General Partner did not earn profits or make distributions to its shareholders. In early 2019, however, Neuman noticed that the Company's annual financial statements appeared to show that fees in excess of management costs were being paid to the General Partner.

11. When Neuman inquired about those fees, Mol and Garcia told him that although Luxembourg regulations required such fees to be paid to the General Partner, any "profits" would be "reinvested" in the Company in a manner that complied with Luxembourg law and resulted "net-zero" profits to the General Partner. Neuman was satisfied by this response for two reasons: (i) he trusted Mol and Garcia; and (ii) in the event the General Partner was earning profits, he was

entitled to 50% of such profits in light of his indirect 50% ownership interest in the General Partner through Pillo Financial.

12. By fall 2020, however, Neuman became aware of certain irregularities in the General Partner's management of the Company's investment funds, including a severe liquidity crisis threatening the funds. Conducting due diligence, Neuman learned for the first time that (i) Pillo Financial breached the Stock Transfer Agreement by liquidating its interest in the General Partner without Neuman's knowledge or consent; and (ii) Garcia now held his interest in the General Partner through Garcia's limited liability company, Pillo Portsmouth, not Pillo Financial.

13. Defendants Mol, Garcia and Heggelman are managing directors of the General Partner and have actively conspired to defraud Neuman of the rights and benefits of his indirect 50% ownership of the General Partner and to prevent Neuman from learning that Pillo Financial breached the Stock Transfer Agreement by transferring its ownership interest in the General Partner to Pillo Portsmouth.

14. Neuman now brings this action to recover damages and declaratory and injunctive relief, including a full accounting of the General Partner, an order setting aside Pillo Financial's fraudulent conveyance of its ownership interest in the General Partner to Pillo Portsmouth, and an injunction precluding the General Partner from taking any further action without Neuman's written consent.

## THE PARTIES

15. Plaintiff Phil Neuman is a citizen of Nevada. Prior to April 1, 2018, Neuman was a citizen and domiciliary of New York. He maintained an office in Nanuet, New York and a regular suite at the Four Seasons Hotel on 57th Street in Manhattan, where he lived at least several days each week.

16. Defendant Jose Garcia is a citizen of Spain who resides in Luxembourg.

17. Defendant Tim Mol is a citizen of the Netherlands who resides in Luxembourg.

18. Defendant Victor Heggelman is a citizen and resident of Luxembourg.

19. Defendant Pillo Portsmouth Holding Company, LLC (previously defined as "Pillo Portsmouth") is a Delaware limited liability company whose sole member is Jose Garcia, a citizen of Spain.

20. Defendant Pillo Financial Consulting Corp. (previously defined as "Pillo Financial") is a corporation organized under the laws of the District of Columbia that, upon information and belief, maintains its principal place of business in the District of Columbia.

21. Defendant Carlisle Investment Group, S.à r.l., (previously defined as the "General Partner") is a company organized under the laws of Luxembourg as a

"*société à responsabilité limitée*"[1] that maintains its principal place of business in Luxembourg and whose registered members are (i) Tim Mol, a citizen of the Netherlands; (ii) Victor Heggelman, a citizen of Luxembourg; (iii) Carlisle Acquisition Vehicle, LLC, a citizen of Delaware, the United Kingdom and Australia; and (iv) Pillo Portsmouth Holding Company, LLC, a citizen of Delaware and Spain.

## JURISDICTION AND VENUE

22. This Court has diversity subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(3) because this is a civil action where the matter in controversy exceeds $75,000, exclusive of interests and costs, and is between citizens of different States and in which citizens or subjects of a foreign state are additional parties.

23. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## BACKGROUND

### A. Garcia Solicits Neuman's Partnership in Luxembourg-Based Life Settlement Investment Funds.

24. In the fall of 2009, Garcia contacted Neuman about the possibility of investing and participating in his new business venture: the formation of investment

[1] An "S.à r.l." may be treated as a corporation or as a limited liability company for diversity subject matter jurisdiction. *See*., *e.g*., *Burge v. Sunrise Medical (US) LLC*, 2013 WL 6467994, *2 (D. Col. December 9, 2013)).

funds based in Luxembourg that would focus on the U.S. market for life insurance settlements. A life settlement is a transaction under which a life insurance policy owner sells the policy to a third party for a fixed sum less than the death benefit but generally greater than the policy's cash surrender value. The buyer is responsible for future premiums but is also entitled to the death benefit when the insured dies. Such transactions can be bundled and traded on secondary or tertiary markets.

25. Neuman agreed to participate and invest in return for 50% ownership of the business, which Garcia represented would be structured as a Luxembourg partnership whose General Partner would manage the investment funds. Garcia had already formed the Luxembourg partnership limited by shares, Carlisle Management Company S.C.A. (previously defined as the "Company"), and its General Partner, Carlisle Investment Group, S.à r.l. (previously defined as the "General Partner").

26. On November 24, 2009, Neuman and Garcia met in New York City at the Four Seasons Hotel on 57th Street, where Neuman lived at least several days each week. At that meeting, they executed the agreement annexed hereto as Exhibit 3, which memorializes their 50-50 partnership in the Company and the General Partner.

**B. The Stock Transfer Agreement.**

27. When they executed the November 24, 2009 agreement, Garcia and Neuman contemplated that additional agreements would be necessary to reflect their

respective ownership interest in the Company and the General Partner "in the method advised by the Company's tax advisor in Luxembourg as to minimize the effect on the Company's tax and regulatory status."

28. In a series of telephone calls between January and April 2010, Garcia told Neuman that registration of Neuman's ownership interest in the General Partner in the shareholders' register of the General Partner, in the trade and companies register of Luxembourg and with the Luxembourg competent authorities should be delayed indefinitely due to such tax and regulatory issues. Garcia represented that no such tax or regulatory issues prevented registration of Neuman's partnership interest in the Company with Luxembourg authorities. Neuman was in New York City and Garcia was in Luxembourg or other locations in Europe for all of these telephone conversations.

29. Garcia also explained in these telephone conversations that his ownership interests in the Company and the General Partner were held indirectly through Pillo Financial. Garcia proposed that because Neuman's 50% interest in the General Partner would not be registered in the shareholders' register of the General Partner, in the trade and companies register of Luxembourg and with Luxembourg competent authorities, Neuman's interest in the General Partner could be secured by transferring a 50% interest in Pillo Financial to Neuman. In contrast, Neuman's 50%

interest in the Company would be registered in the shareholders' register of the Company and with the Luxembourg competent authorities and there was no reason for Neuman to indirectly hold his interest in the Company through Pillo Financial. For that reason, Garcia told Neuman that he would cause Pillo Financial's interest in the Company, which would be reduced to 50% after Neuman's interest in the Company was registered, to another Garcia-controlled company.

30. On or about April 8 and 9, 2010, Neuman and Garcia met in New York City to draft and execute written agreements reflecting their understanding regarding the ownership structure of their interests in the Company and the General Partner. Their meetings took place at restaurants and lounges located at the Four Seasons Hotel on 57th Street. At one of their meetings on April 9, 2010, they executed the following agreements:

(i) The Stock Transfer Agreement annexed hereto as Exhibit 1, under which Garcia transferred a 50% ownership interest in Pillo Financial to Neuman with the promise that Pillo Financial's ownership interest in the General Partner would not be transferred without Neuman's consent;

(ii) The Pillo Financial Stock Certificate annexed hereto as Exhibit 2, which reflected Neuman's 50% ownership interest in that corporation;

(iii) A Share Sale and Purchase Agreement annexed as Exhibit 4, which transferred 50% of the outstanding shares of the General Partner from Pillo Financial to Neuman; and

(iv) A Share Sale and Purchase Agreement annexed hereto as Exhibit 5, which transferred 50% of the outstanding shares of the Company from Pillo Financial to Neuman.

31. Each of these agreements contains a choice of law provision providing that the agreement is governed by New York law. The Stock Transfer Agreement contains a choice of forum provision providing that the New York is the exclusive jurisdictions for any disputes "arising under or in connection with" that agreement. *See* Stock Transfer Agreement (Exhibit 1) at § 5 ("This Agreement … shall be governed by the laws of the state of New York … and … any claims, disputes or disagreements arising under or in connection with this Agreement … shall be brought by any of the Parties in the state or federal courts of the state of New York, and each of the Parties hereby submits to the exclusive jurisdiction of such courts in any such actions or proceeding and waives any objection to the jurisdiction or venue of such courts.").

**C. Garcia Fraudulently Induces Neuman to Reduce His Ownership Interest in the Company to 20%.**

32. By the spring of 2012, disputes between Neuman and Garcia had arisen regarding management and control of the Company and its investment funds. In April 2012, they agreed to resolve those disputes based on the following terms:

(i) Neuman would reduce his ownership interest in the

Company from 50% to 20% in return for a cash payment and other consideration; and

(ii) Neuman would no longer actively participate in the management of the Company, but he would retain his 50% interest in the General Partner to retain "veto" power over management decisions to which he disagreed.

33. To implement these understandings, Neuman, Garcia and Mol executed an agreement dated April 27, 2012 under which Neuman's ownership interest in the Company was reduced to 20% in return for certain payments and other consideration. That agreement, which is expressly limited to "existing agreements with regard to Carlisle Management Company SCA," *i.e.*, the Company, is annexed hereto as Exhibit 6 (the "April 27, 2012 Agreement").

34. The April 27, 2012 Agreement was negotiated between Neuman, Garcia and Mol primarily through a series of telephone calls on April 27, 2012. Neuman and Mol were in Geneva and Garcia was in Luxembourg during these negotiations and when the April 27, 2012 Agreement was executed. The basic structure of the agreement as set forth in paragraph 32, *supra*, was negotiated in telephone calls between Neuman, in Geneva, and Garcia, in Luxembourg. During these initial phone calls, in which Mol did not participate, Garcia made two false representations to Neuman:

(i) Neuman's 50% ownership interest in the Company had

already been registered in the shareholders' register of the Company and with the Luxembourg competent authorities;

(ii) Neuman's 50% ownership interest in the General Partner was still secured by Neuman's 50% ownership interest in Pillo Financial.

35. In fact, Garcia knew that each of these representations was false: (i) Neuman's ownership interest in the Company had not been registered in the shareholders' register of the Company and with the Luxembourg competent authorities; and (ii) Pillo Financial no longer held any interest in the General Partner because Garcia had caused Pillo Financial to transfer all of its interest in the General Partner to Pillo Portsmouth on or about May 11, 2011.

36. Garcia made these false representations with the intention of inducing Neuman into entering into the April 27, 2012 Agreement and to agreeing to reduce his ownership interest in the Company from 50% to 20%. Neuman reasonably relied on those representations when he executed the April 27, 2012 Agreement.

37. In these initial April 27, 2012 phone calls between Neuman and Garcia, Neuman expressed concern that if he reduced his management role in the Company, he would no longer have veto power over decisions that jeopardized the Company's operation and future success. In response, Garcia pointed out that Neuman still owned a 50% beneficial interest in the General Partner through Neuman's 50%

interest in Pillo Financial. Garcia said that Neuman' 50% beneficial interest in the General Partner gave him "blocking power" since the other members of the General Partner did not have a majority interest. Garcia made this representation knowing that it was false because he had caused Pillo Financial to transfer its ownership interest in the General Partner to Pillo Portsmouth as of May 11, 2011.

38. Garcia also assured Neuman during these initial phone calls on April 27, 2012 that Neuman's beneficial interest in the General Partner and in Pillo Financial would not be affected by the April 27, 2012 Agreement, which would merely supersede prior agreements between Neuman and Garcia relating to the ownership of the Company as opposed to the General Partner. Garcia pointed out that the agreements reflecting Neuman's beneficial interest in the General Partner were not simply between him and Neuman but were either between Pillo Financial and Neuman or among Pillo Financial, Neuman and Garcia.

39. After Garcia and Neuman had agreed to the basic structure of the April 27, 2012 Agreement as set forth in paragraph 32, *supra*, Mol functioned as a mediator and scrivener to work out the precise wording of the agreement. To do so, Mol conducted separate conversations with Garcia and Neuman. Mol's conversations with Neuman took place in person at Four Seasons Hotel in Geneva. Mol's conversations with Garcia took place by phone, with Mol in Geneva and

Garcia in Luxembourg. By late afternoon, Neuman, Garcia and Mol had agreed to the wording. Neuman and Mol executed the agreement in Geneva and sent a PDF of the agreement with their signatures to Garcia, who executed it in Luxembourg.

40. In May and June 2012, Mol contacted Neuman by phone for the purpose of completing the paperwork necessary to register Neuman's ownership interest in the Company, which the April 27, 2012 Agreement promised would be completed within 120 days. *See* April 27, 2012 Agreement (Exhibit 6) at ¶ 7. Neuman provided Mol with the requested information and assumed that his 20% ownership interest in the Company had been registered in accordance with the April 27, 2012 Agreement.

### D. Garcia, Mol and Heggelman Continue to Fraudulently Conceal that Pillo Financial Transferred its Ownership Interest in the General Partner to Pillo Portsmouth.

41. After the April 27, 2012 Agreement was executed, Garcia, Neuman and Mol continued to meet at least two or three times a year to discuss the Company and its business. At these meetings, Garcia continued to assure Neuman that his beneficial interest in the General Partner was secured through his 50% ownership interest in Pillo Financial, which held both Garcia's and Neuman's ownership interest in the General Partner. Mol and Heggelman were present when Garcia made these representations. Even though these observed Garcia making these

representations and knew that Pillo Financial no longer owned any interest in the General Partner, they failed to disclose that fact to Neuman.

42. In January or February 2013, Garcia called Neuman and conceded that he had never registered Neuman's ownership interest in the Company in the shareholders' register of the Company and with the Luxembourg competent authorities despite Garcia's representations to the contrary. At the time of this phone call, Neuman was at the Four Seasons Hotel on 57th Street in Manhattan and Garcia was in Luxembourg. Garcia explained that he had intended to register Neuman's ownership interest, but that he had never done so due to the press of other business activity.

43. Garcia also explained during this call that, as he had represented in April 2010, Pillo Financial had transferred its ownership interest in the Company to another Garcia-controlled company so that Neuman's 50% ownership interest in Pillo Financial would not interfere with Garcia's ownership interest in the Company. Garcia told Neuman that the company that now owned both Garcia's and Neuman's interest in the Company was Pillo Portsmouth. Consequently, Pillo Financial no longer owned any interest in the Company and therefore could not perform its obligation under the April 9, 2010 Share Sale and Transfer Agreement annexed hereto as Exhibit 5 to transfer a 50% ownership interest in the Company to Neuman.

And because Neuman had agreed to reduce his ownership interest in the Company to 20% pursuant to the April 27, 2012 Agreement, transferring a 50% ownership interest was no longer necessary or appropriate.

44. During this call, Garcia proposed that the most efficient means of registering Neuman's 20% interest in the Company was to execute a new share purchase agreement with Pillo Portsmouth, which was at that time the registered owner of Garcia's and Neuman's interest in the Company. After that agreement was executed, Neuman's ownership share could be registered in the Company's shareholders' register and with the Luxembourg competent authorities. Garcia also assured Neuman that Pillo Financial still owned his interest in the General Partner and that Neuman's 50% interest in the General Partner was therefore secure since Neuman owned 50% of Pillo Financial.

45. On March 22, 2013, Neuman, Mol, and Heggelman met in Luxembourg. During that meeting, Garcia presented Neuman with a Share Purchase Agreement under which Pillo Portsmouth transferred a 20% ownership interest in the Company to Neuman. That agreement is annexed hereto as Exhibit 7. During that meeting, Garcia again assured Neuman that his 50% beneficial ownership interest in the General Partner was still secured by Neuman's 50% ownership interest in Pillo Financial, which still held both Garcia's and Neuman's ownership interest

in the General Partner. Both Mol and Heggelman were present when Garcia made those representations. Neither Mol nor Heggelman attempted to contradict or clarify Garcia's representations in any way.

46. After Neuman returned to New York, Mol again contacted him to take the necessary steps to register Neuman's 20% interest in the Company and, upon information and belief, that ownership interest was registered in the shareholders' register of the Company and with the Luxembourg competent authorities. During telephone conversations between Neuman and Mol to accomplish that task over the summer of 2013, Neuman mentioned that he was still the beneficial owner of 50% of the General Partner pursuant to the April 9, 2010 Share Sale and Purchase Agreement with Pillo Financial (Exhibit 4) and the April 9, 2010 Stock Transfer Agreement (Exhibit 1).

47. Mol asserted that Neuman might be mistaken because the April 27, 2012 Agreement, to which Mol was a party, provided that "[a]ll prior agreements between [Garcia] and [Neuman] are superseded by this memo of agreement." *See* April 27, 2012 Agreement (Exhibit 6) at ¶ 1. Neuman pointed out, however, that he continued to retain his 50% beneficial interest in the General Partner based on several facts:

(i) the April 27, 2012 Agreement was restricted to "existing

agreements [between Neuman and Garcia] *with regard to Carlisle Management Company SCA*" and therefore did not apply to agreements concerning the General Partner. *Id*. at WHEREAS clause (emphasis added);

(ii) Neuman' beneficial ownership interest in the General Partner arose from his April 9, 2010 Share Purchase Agreement with *Pillo Financial* (annexed hereto as Exhibit 4) and therefore did not constitute an agreement between him and Garcia;

(iii) In agreeing to reduce his ownership interest in the Company to 20% and step back from day-to-day management, it was critical for Neuman to have veto power over any management decisions to which he strongly disagreed and retention of his 50% beneficial interest in the General Partner provided this veto power;

(iii) Garcia himself had explained these facts to Neuman during their initial phone calls on April 27, 2021; and

(iv) Garcia had consistently represented that Neuman retained his 50% beneficial interest in the General Partner at several meetings since the April 27, 2012 Agreement and Mol had been present and observed Garcia making these representations, including at the March 2013 meeting in Luxembourg.

48. Mol agreed with Neuman's analysis and apologized for his confusion, which Mol explained arose because Mol was not a party to, and was unfamiliar with the terms of, the April 9, 2010 agreements reflecting Neuman's 50% beneficial interest in the General Partner. He also asserted that he did not remember Garcia's representations that Neuman retained his 50% ownership interest in the General

Partner, he now recalled that Garcia had made those representations at the March 22, 2013 meeting in Luxembourg.

49. Between 2013 and 2019, Neuman met with Garcia, Mol and Heggelman to discuss the Company at least two or three times each year, including but not limited to the following:

(i) On or about November 18, 2015, Garcia, Mol and Neuman met at the Riverside Hotel in Fort Lauderdale, Florida, and traveled together on November 19, 2015 to New York City, where Garcia and Mol stayed at the Paramount Times Square Hotel and Neuman stayed in his suite at the Four Seasons Hotel. They had multiple meetings in Fort Lauderdale and at restaurants and lounges of the Four Seasons Hotel on 57th Street in Manhattan.

(ii) Between February 11 and 14, 2017, Garcia, Mol and Neuman met in Miami, Florida and thereafter traveled together to New York, where they held several meetings at the restaurants and lounges of the Four Seasons Hotel on 57th Street in Manhattan.

(iii) In July 2017, Mol, Heggleman and Neuman attended a life insurance conference in Austin, Texas where they held several meetings.

(iv) In December 2018, Garcia, Mol and Neuman met at the Four Seasons Hotel on 57th Street in Manhattan, where they held several meetings at the restaurants and lounges of the hotel.

(v) In June 2019, Garcia, Mol, Heggelman and Neuman met in Luxembourg, where they held several meetings at the Company's offices and at the Royal Luxembourg Hotel.

50. At each of these meetings, Neuman made a point of joking with Garcia and/or Mol that he retained veto power over any management decision to which Neuman disagreed due to Neuman's 50% beneficial interest in the General Partner, which he held through his 50% ownership interest in Pillo Financial. Garcia consistently agreed that Neuman held such veto power. Mol and Heggelman were present for, and observed, these representations. Even though they knew that Garcia's representations were false because Pillo Financial had transferred all of its ownership interest in the General Partner to Pillo Portsmouth as of May 11, 2011, they did not inform Neuman that Pillo Financial no longer owned any interest in the General Partner.

**E. Neuman Discovers the Fraud.**

51. For years, Neuman trusted Garcia and Mol to manage the Company and to protect his interests. In early 2019, however, Neuman noticed that some of the financial statements appeared to indicate that the General Partner was earning management fees in excess of costs. When Neuman inquired about these fees, Mol and Garcia falsely represented that Luxembourg regulations required the General Partner to earn these fees, but that the fees would be "reinvested" into the Company so that the General Partner would not retain significant profits and the policy of no

distributions to General Partner shareholders would continue.

52. Neuman accepted these representations because he trusted Garcia and Mol. He also believed that even if the General Partner earned and distributed profits, Garcia would have to distribute 50% of the profits to Neuman based on Neuman's 50% interest in the General Partner, which Neuman owned through his 50% ownership of Pillo Financial.

53. By the fall of 2020, however, Neuman became aware of irregularities in the Company's management, including a severe liquidity crisis facing the Company's primary investment fund, the Luxembourg Life Fund, Long Term Growth Fund. Neuman retained counsel, including Luxembourg counsel, to investigate and learned for the first time that Pillo Financial had liquidated its ownership interest in the General Partner as of May 11, 2011 and that Garcia owned his interest in the General Partner since that date through Pillo Portsmouth.

**FIRST CLAIM FOR RELIEF**
**(Breach of the Stock Transfer Agreement**
**– against Garcia and Pillo Financial)**

54. Neuman repeats and realleges each of the allegations set forth in paragraphs 1 through 53.

55. On or about April 9, 2010, Neuman, Garcia and Pillo Financial entered into the Stock Transfer Agreement. That agreement prohibits Pillo Financial from

issuing new shares or transferring assets, including its ownership of the General Partner, without Neuman's written consent:

> … no new shares of Pillo [Financial] shall be issued, and no assets or property of Pillo [Financial] including its shares of Carlisle [Investment Group, S.à r.l.] will be transferred, assigned, sold or encumbered without the written consent of both Neuman and Garcia.

Stock Transfer Agreement (Exhibit 1) at § 3.

56. Neuman performed all of his obligations under the Stock Transfer Agreement.

57. On or about May 11, 2011, Garcia caused Pillo Financial to liquidate its ownership interest in the General Partner without Neuman's knowledge or consent. Garcia and Pillo Financial breached the Stock Transfer Agreement by liquidating Pillo Financial's ownership interest in the General Partner.

58. Garcia and Pillo Financial fraudulently concealed their transfer of Pillo Financial's interest in the General Partner from Neuman and repeatedly falsely represented that Pillo Financial still owned Garcia's and Neuman's interest in the General Partner as set forth in more detail, *supra*, in paragraphs 6-9, 34-38, and 41-50. Mol and Heggelman were present at many of these meetings, and they observed Garcia make these fraudulent omissions and representations as set forth in more detail, *supra*, in paragraphs 6-9, 34-38, and 41-50. Although they knew that the

representations were false, they did not disclose that fact to Neuman.

59. Garcia knew that after May 11, 2011 his representations that Pillo Financial held his and Neuman's interest in the General Partner were false. He made those representations with knowledge of their falsity for the purpose of preventing Neuman from enforcing his contractual rights.

60. Because Pillo Financial's liquidation of its ownership interest in the General Partner has deprived Neuman of his 50% beneficial ownership interest in the General Partner, Neuman has no adequate remedy at law to compensate him for Garcia's and Pillo Financial's breach of the Stock Transfer Agreement.

61. Neuman has suffered irreparable damage as a result of Pillo Financial's liquidation of its ownership interest in the General Partner and he is entitled to specific performance of the Stock Transfer Agreement in the form of a judgment setting aside the liquidation and enjoining Pillo Portsmouth to transfer its ownership interest in the General Partner to Pillo Financial.

**SECOND CLAIM FOR RELIEF**
**(Fraudulent Inducement – against Garcia)**

62. Neuman repeats and realleges each of the allegations set forth in paragraphs 1 through 61.

63. As set forth, *supra*, at paragraphs 34 through 38, Garcia falsely

represented to Neuman in ]calls on April 27, 2012 that Neuman's ownership interest in the General Partner was secure by virtue of Neuman's 50% interest in Pillo Financial, which owned both Neuman's and Garcia's interest in the General Partner.

64. Garcia made those representations knowing they were false because, in fact, at Garcia's direction, Pillo Financial had transferred its ownership interest in the General Partner to Pillo Portsmouth as of May 11, 2011 – almost one year before Garcia's April 27, 2012 representations.

65. Garcia made those representations with knowledge of their falsity for the purpose of inducing Neuman into executing the April 27, 2012 Agreement under which Neuman reduced his ownership interest in the Company from 50% to 20%.

66. Neuman reasonably relied on Garcia's representations. Neuman had financed Garcia's vision for the Company, without which Garcia's vision could not have been realized. For the past two and a half years, Neuman and Garcia had worked together as partners for two and a half years to build a successful business. Although they disagreed on certain issues, Neuman trusted Garcia, believed that he was working in good faith to advance their joint interests and considered Garcia to be a friend. Neuman had a stock certificate reflecting his 50% ownership interest in Pillo Financial, the sole purpose of which was to secured Neuman's 50% beneficial ownership interest in the General Partner. Neuman could not imagine that Garcia

had violated their trust and friendship by transferring Pillo Financial's interest in the General Partner to controlled solely owned and controlled by Garcia. Had Neuman known that Garcia and Pillo Financial had breached the Stock Transfer Agreement by transferring Pillo Financial's interest in the General Partner to Pillo Portsmouth, Neuman would never have executed the April 27, 2012 Agreement.

67. Neuman's reliance on Garcia's false representations caused Neuman to incur damages, including the loss of a 30% ownership interest in the Company.

**THIRD CLAIM FOR RELIEF**
**(Declaratory Judgment that the April 27, 2012 Agreement is Null and Void – against Garcia and Mol)**

68. Neuman repeats and realleges each of the allegations set forth in paragraphs 1 through 67.

69. On April 27, 2012, Neuman, Garcia and Mol entered into the April 27, 2012 Agreement. That agreement, which refers to Neuman as "PN," Garcia as "JG," and Mol as "TM," includes the following paragraphs:

> 2. PN will have Complete use of and access to existing and future Carlisle offices at all times. This will include answering phones on his behalf, full reception services, a designated desk and computer, and the availability to have meetings in conference rooms.
>
> 4. PN will remain present on the Carlisle website and have a Carlisle email.

> 6. PN will have Exclusive use of T.H. Mol of 25% of his time including travel. A separate consultancy agreement will be concluded between TM and PN.
>
> 7. PN will receive 20% of shares in Carlisle. PN understands that since Carlisle is a company regulated by the [SEC-equivalent] CSSF, prior approval of the CSSF is needed before the share transfer Agreements can be executed. T.H. Mol will handle mentioned approval process with the CSSF; this will be completed within 120 Days.
>
> 9. *Any Default* under this agreement will make it null and void.

April 27, 2012 Agreement (Exhibit 6) at ¶¶ 2, 4, 6, 7, and 9 (emphasis added).

70. Neuman performed all of his obligations under the April 27, 2012 Agreement.

71. Garcia and Mol, however, defaulted on each of their obligations set forth in paragraphs 2, 4, 6 and 7 of the April 27, 2012 Agreement as quoted, *supra*, at paragraph 68. In particular,

(i) Neuman never received "full access" to the Carlisle offices, or to the desk, equipment and services promised in paragraph 2 of the April 27, 2012 Agreement.

(ii) After Neuman commenced this action in December 2020, Garcia and Mol removed Neuman from the Carlisle website despite the promises made in paragraph 4.

(iii) Neuman did not receive exclusive use of 25% of Mol's time; on the contrary, Mol refused to enter into a consultancy agreement as promised in paragraph 6.

(iv) The share transfer process was not initiated or approved by the CSSF "within 120 Days" as promised in paragraph 7; on the contrary, that process was not even started until March 2013 when Garcia conceded that Neuman's ownership interest had not been previously registered, *see*, *supra*, at ¶¶ 42-46.

72. Each of these defaults rendered the April 27, 2012 Agreement "null and void" by its own terms. *See* April 27, 2012 Agreement (Exhibit 6) at ¶ 9.

**FOURTH CLAIM FOR RELIEF**
**(Breach of Fiduciary Duty – against Garcia)**

73. Neuman repeats and realleges each of the allegations set forth in paragraphs 1 through 72.

74. The agreements dated November 24, 2009 and April 9, 2010, including the Stock Transfer Agreement, created a fiduciary relationship between Garcia and Neuman due to their joint ownership of the Company and the General Partner.

75. Garcia owed Neuman fiduciary duties to comply with his obligations under those agreements, to provide accurate information regarding the Company and the General Partner, and to refrain from elevating Garcia's interests over Neuman's interests with respect to the Company and the General Partner.

76. Garcia breached his fiduciary duties to Neuman by causing Pillo Financial on May 11, 2011 to liquidate its interest in the General Partner to transfer Garcia's ownership interest in the General Partner to Pillo Portsmouth without

Neuman's knowledge and consent. Garcia continued to breach those duties by falsely representing to Neuman from April 2012 through June 2019 that Pillo Financial was still the registered owner of Garcia's and Neuman's interest in the General Partner when, in fact, Pillo Financial had liquidated its interest in the General Partner by transferring that interest to Pillo Portsmouth.

77. Because Pillo Financial's liquidation of its ownership interest in the General Partner has deprived Neuman of his 50% beneficial ownership interest in the General Partner, Neuman has no adequate remedy at law to compensate him for Garcia's breach of his fiduciary duties.

**FIFTH CLAIM FOR RELIEF**
**(Breach of Fiduciary Duty –**
**against Garcia, Pillo Portsmouth, and Mol, Heggelman)**

78. Neuman repeats and realleges each of the allegations set forth in paragraphs 1 through 77.

79. Pillo Portsmouth, Mol, and Heggelman, as registered owners of the General Partner, and Garcia, through his indirect beneficial ownership interest in the General Partner, owed fiduciary duties to Neuman arising from Neuman's beneficial ownership interest of 50% of the General Partner.

80. Upon information and belief, the General Partner has earned profits over the years and distributed those profits to its registered owners, Pillo Portsmouth,

Mol, and Heggelman and to Garcia, through his ownership interest in Pillo Portsmouth.

81. Upon information and belief, the registered owners of the General Partner, including Pillo Portsmouth, Mol, Heggelman, and Garcia, indirectly through Pillo Portsmouth, have excluded Neuman from any distribution of profits despite their knowledge that Neuman was the beneficial owner of a 50% interest in the General Partner.

82. Pillo Portsmouth, Garcia, Mol, Heggelman breached their fiduciary duties by excluding Neuman from distribution of profits and by falsely representing that the General Partner has neither earned nor distributed profits.

83. As a proximate cause of these breaches, Neuman has incurred monetary damages in an amount to be proven at trial and is entitled to a full accounting of the finances of the General Partner from its inception to date.

**SIXTH CLAIM FOR RELIEF**
**(Conversion – Against Garcia, Pillo Financial and Pillo Portsmouth)**

84. Neuman repeats and realleges each of the allegations set forth in paragraphs 1 through 83.

85. Neuman has the right to a 50% beneficial interest in the General Partner arising from (i) the April 9, 2010 Share Sale and Transfer Agreement between Pillo

Financial and Neuman annexed hereto as Exhibit 4, which transferred a 50% interest in the General Partner to Neuman; and (ii) the Stock Transfer Agreement annexed hereto as Exhibit 1, which transferred a 50% interest in Pillo Financial to Neuman.

86. Garcia caused Pillo Financial to liquidate its interest in the General Partner and to transfer Neuman's 50% beneficial interest in the General Partner to Pillo Portsmouth without Neuman's knowledge or consent.

87. Because Garcia did not own a majority of Pillo Financial, Garcia did not have authority to cause Pillo Financial to transfer Neuman's 50% beneficial interest in the General Partner to Pillo Portsmouth without Neuman's consent. And the Stock Transfer Agreement prohibited Pillo Financial from making that transfer.

88. Garcia is the only member of, and exercises exclusive control over, Pillo Portsmouth.

89. Pillo Portsmouth knew that Pillo Financial's transfer of Neuman's 50% interest in the General Partner was unauthorized. Pillo Portsmouth nevertheless accepted that transfer and subsequently took steps to register its interest in the General Partner in the shareholders' register of the General Partner, in the trade and companies register of Luxembourg and with the Luxembourg competent authorities.

90. Pillo Financial's transfer of Neuman's 50% beneficial interest in the General Partner and Pillo Portsmouth's acceptance of that transfer constitute

interference with Neuman's beneficial ownership of 50% of the General Partner. The transfer of Neuman's interest in the General Partner by Pillo Financial and Pillo Portsmouth's acceptance of that transfer deprived Neuman of his 50% beneficial ownership interest in the General Partner, thereby constituting a wrongful conversion of Neuman's personal property.

91. Garcia caused Pillo Financial to transfer Neuman's 50% interest in the General Partner and caused Pillo Portsmouth to accept that transfer. Garcia thereby deprived Neuman of his 50% beneficial ownership interest in the General Partner, thereby constituting a wrongful conversion of Neuman's personal property.

92. Garcia, Pillo Financial and Pillo Portsmouth acted intentionally when they caused Neuman's 50% beneficial interest in the General Partner to be transferred from Pillo Financial to Pillo Portsmouth.

93. The wrongful conversion of Neuman's 50% interest in the General Partner by Garcia, Pillo Financial and Pillo Portsmouth caused Neuman to incur substantial damages and special damages in an amount in excess of $10 million.

**SEVENTH CLAIM FOR RELIEF**
**(Conspiracy to Commit Conversion – against Garcia, Mol, Heggelman, Pillo Financial and Pillo Portsmouth)**

94. Neuman repeats and realleges each of the allegations set forth in paragraphs 1 through 93.

95. Garcia, Pillo Financial and Pillo Portsmouth wrongfully converted Neuman's ownership interest in the General Partner as set forth, *supra*, at ¶¶ 84-93.

96. Garcia, Mol, Heggelman, Pillo Financial and Pillo Portsmouth agreed to take steps to deprive Neuman of his 50% beneficial interest in the General Partner and to continue to deprive Neuman of his beneficial interest in the General Partner.

97. Garcia, Mol, Heggelman, Pillo Financial, and Pillo Portsmouth each committed an overt act in furtherance of that agreement. Garcia, Pillo Financial and Pillo Portsmouth wrongfully converted Neuamn's interest in the General Partner. Mol and Heggelman knew of this wrongful conversion but failed to disclose it to Neuman despite his fiduciary duty to do so.

98. Garcia, Mol, Heggelman, Pillo Financial, and Pillo Portsmouth participated in a plan to deprive, and therefore wrongfully convert, Neuman of his 50% beneficial interest in the General Partner.

99. As a proximate cause of this conspiracy, Neuman sustained substantial damages to be proven at trial in excess of $10 million dollars.

**EIGHTH CLAIM FOR RELIEF**
**(Fraud – against Garcia, Mol, Pillo Financial and Pillo Portsmouth)**

100. Neuman repeats and realleges each of the allegations set forth in paragraphs 1 through 99.

101. Garcia, Mol, Pillo Financial and Pillo Portsmouth made fraudulent omissions or false representations to Neuman as set forth in more detail, *supra*, at paragraphs 6-11, 34-38, and 41-50.

102. Garcia, Mol, Pillo Financial and Pillo Portsmouth made those fraudulent omissions and false representations knowing that they were false and with the intent of inducing Neuman to refrain from taking any steps to enforce his contractual rights to his beneficial ownership of 50% of the General Partner.

103. Neuman reasonably relied on those fraudulent omissions and misrepresentations and thereby failed to enforce his contractual rights to his beneficial ownership of 50% of the General Partner.

104. As a proximate cause of these misrepresentations, Neuman sustained damage to be proven at trial of at least $10 million dollars in addition to other special damages to be proven at trial.

**NINTH CLAIM FOR RELIEF**
**(Conspiracy to Commit Fraud – against Garcia, Mol, Heggelman, Pillo Financial and Pillo Portsmouth)**

105. Neuman repeats and realleges each of the allegations set forth in paragraphs 1 through 104.

106. Garcia, Mol, Pillo Financial and Pillo Portsmouth made fraudulent omissions and/or false representations to Neuman as set forth in more detail, *supra*,

at paragraphs 6-11, 34-38, and 41-50.

107. Neuman reasonably relied on these fraudulent omissions and false representations to not enforce his contractual rights to 50% of the beneficial ownership of the General Partner.

108. Garcia, Mol, Pillo Financial, Pillo Portsmouth and Heggelman agreed that these fraudulent omissions and false representations would be made in an effort to induce Neuman not to enforce his rights to 50% of the beneficial ownership of the General Partner.

109. Garcia, Mol, Pillo Financial, Pillo Portsmouth and Heggelman each committed an overt act in furtherance of that agreement. Garcia, Mol, Pillo Financial and Pillo Portsmouth made the fraudulent omissions and false representations. Heggelman knew of these fraudulent omissions and false representations but failed to disclose them to Neuman despite his fiduciary duty to do so.

110. Garcia, Mol, Pillo Financial, Pillo Portsmouth and Heggelman intentionally participated in a plan to fraudulently induce Neuman to fail to enforce his rights to 50% of the beneficial interest in the General Partner.

111. As a proximate cause of this conspiracy, Neuman sustained substantial damages to be proven at trial in excess of $10 million dollars.

**NINTH CLAIM FOR RELIEF**
**(Fraudulent Conveyance –**
**against Garcia, Pillo Financial and Pillo Portsmouth)**

112. Neuman repeats and realleges each of the allegations set forth in paragraphs 1 through 111.

113. Garcia and Pillo Financial fraudulently conveyed Pillo Financial's interest in the General Partner to Pillo Portsmouth for the purpose of depriving Neuman of his 50% beneficial interest in the General Partner.

114. Pillo Portsmouth accepted that transfer and subsequently registered its interest in the General Partner in the shareholders' register of the General Partner, in the trade and companies register of Luxembourg and with the Luxembourg competent authorities for the purpose of depriving Neuman of his 50% beneficial interest in the General Partner.

115. Garcia, Pillo Financial, and Pillo Portsmouth acted intentionally to fraudulently deprive Neuman of his 50% beneficial interest in the General Partner.

116. Neuman is entitled (i) to have the fraudulent conveyance of his 50% beneficial interest in the General Partner from Pillo Financial to Pillo Portsmouth set aside; and (ii) to obtain damages in an amount to be proven at trial arising out of the wrongful conduct of Garcia, Pillo Financial and Pillo Portsmouth.

## JURY DEMAND

117. Plaintiffs demand a jury on all issues that may be tried by jury.

WHEREFORE, Neuman demands judgment as follows:

(i) damages in an amount to be proven at trial of at least $10 million;

(ii) a declaratory judgment that Garcia and Pillo Financial breached the Stock Transfer Agreement by liquidating Pillo Financial's interest in the General Partner and transferring Neuman's 50% beneficial interest in the General Partner to Pillo Portsmouth;

(iii) a declaratory judgment that the April 27, 2012 Agreement is null and void;

(iv) an order setting aside Pillo Financial's transfer of Neuman's 50% beneficial interest in the General Partner to Pillo Portsmouth;

(v) an injunction directing Garcia and Pillo Portsmouth to transfer a 50% interest in the General Partner to Neuman and to take all steps necessary to register Neuman's interest in the General Partner in the shareholders' register of the General Partner, in the trade and company register of Luxembourg and with the Luxembourg competent authorities;

(vi) a full accounting of the General Partner, its finances and all distributions made to its shareholders from its inception to the present;

(vii) an injunction prohibiting the General Partner from taking any action without Neuman's consent in light of his 50% beneficial interest in the General Partner;

(viii) transfer of 30% ownership interest in the Company from Garcia to Neuman;

(ix) damages against Garcia in the amount of distributions and any other compensation arising from his ownership of a 30% interest in the Company from April 27, 2012 to the present;

(x) costs, including reasonable attorneys' fees, incurred in this action; and

(xi) such other relief as this Court deems just.

Dated: March 12, 2021

THE GRIFFITH FIRM

*/s/ Edward Griffith*

By:______________________________

EDWARD GRIFFITH, ESQ.

45 Broadway, Suite 2200
New York, New York 10006
(646) 645-3784 (mobile)
eg@thegriffithfirm.com

*Counsel for Plaintiff Phil Neuman*