# Exhibit A

ETUDE Carlos CALVO
HUISSIERS DE JUSTICE ASSOCIÉS
Luxembourg

HUISSIERS DE JUSTICE
Carlos CALVO
Frank SCHAAL

L-1461 LUXEMBOURG • 65, rue d'Eich (Adr. Postale : B.P.2625 • L-1026 Luxembourg)

# ASSIGNATION DEVANT LE TRIBUNAL D'ARRONDISSEMENT DE ET A LUXEMBOURG

3527 271450 / AK / **A68652**

L'an deux mille vingt-et-un, le - 04 - octobre

A la requête de :

1) **Pillo Portsmouth Holding Company, LLC** , une *limited liability corporation* incorporée sous les lois de l'Etat de Delaware, établie et ayant son siège social à 251 Little Falls Drive, Wilmington, New Castle, 19808 Delaware, Etats-Unis d'Amérique, immatriculée au Delaware Division of Corporation sous le numéro 4211817, représentée aux fins des présentes par son conseil d'administration actuellement en fonctions, sinon son ou ses représentants légaux dûment habilité(s) à la représenter actuellement en fonctions (ci-après « **Pillo** ») ;

TIMBRE DE DIMENSION GRAND-DUCHÉ DE LUXEMBOURG 2€

sinon, et pour autant que de besoin,

2) **Jose Esteban Casares Garcia**, *chief executive officer,* résidant professionnellement sis à 9 rue Sainte Zithe, 1st floor, L-2763 Luxembourg (ci-après « **Jose Garcia** ») en sa qualité de gérant et actionnaire unique de Pillo ;

ORIGINAL

pour lesquelles est constituée et occupera la société **Arendt & Medernach**, société anonyme inscrite au Barreau de Luxembourg, établie et ayant son siège social à L-1855 Luxembourg, 41A, Avenue J.F. Kennedy, immatriculée au registre de commerce et des sociétés de Luxembourg sous le numéro B186371, représentée aux fins des présentes par **Maître François Kremer**, avocat à la Cour, demeurant professionnellement à Luxembourg ; la société Arendt & Medernach au siège social de laquelle domicile est élu ;

Je soussigné* **Carlos CALVO / ~~Frank SCHAAL~~**, Huissier de Justice, demeurant(s) à L-1461 LUXEMBOURG, 65, rue d'Eich, immatriculé(s) près le tribunal d'arrondissement de et à Luxembourg
*(* ☐ Laura GEIGER ☐ Christine ~~KOVELTER, ☐ Kelly FERREIRA~~ SIMOES, huissier de justice suppléant, en remplacement de..) (cet alinéa est réputé non écrit s'il n'est pas coché)*

ai donné assignation à:

1) **Monsieur Philip Neuman**, né le 26 mars 1965 à New York, Etats-Unis d'Amérique, résidant professionnellement sis à 1000 North Green Valley Parkway Suite 440 Unit 396, Henderson, Nevada 89074, Etats-Unis d'Amérique (ci-après « **Phil Neuman** ») ;

2) la société en commandite par actions **CARLISLE MANAGEMENT COMPANY S.C.A.**, établie et ayant son siège social à L-2763 Luxembourg, 9, rue Sainte-Zithe, immatriculée au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B144257, représentée par son actionnaire gérant commandité actuellement en fonctions ;

à comparaître par ministère d'avocat à la Cour dans le délai de la loi qui est de quinze outre les délais de distance s'il y a lieu devant le Tribunal d'arrondissement de et à Luxembourg, siégeant en matière commerciale, mais selon la procédure civile, à la Cité judiciaire, Plateau du Saint-Esprit, L-2080 Luxembourg ;

avec mention que si la signification de l'assignation est faite à personne et que la partie défenderesse ne comparaît pas, le jugement à intervenir sera réputé contradictoire et n'est pas susceptible d'opposition, mais uniquement d'appel, au vœu des articles 79 et 80 du Nouveau Code de procédure civile ;

**pour :**

## I. FAITS ET RETROACTES

### A. La relation contractuelle entre Pillo et M. Neuman

Carlisle Management Company S.C.A. (la « **Société** ») est une société en commandite par action qui est une société de gestion au sens du chapitre 16 de la loi du 10 décembre 2010 concernant les organismes de placement collectif ainsi qu'un gestionnaire de fonds d'investissement alternatifs au sens de la loi du 12 juillet 2013 relative aux gestionnaires de fonds d'investissements alternatifs. Elle investit dans le domaine des assurances-vie. La Société est surveillée par la Commission de Surveillance du Secteur Financier (la « **CSSF** »).

La Société a à l'heure actuelle environ 2,3 milliards EUR d'actifs sous gestion.

La Société a (i) un associé commandité, à savoir la société à responsabilité limitée Carlisle Investment Group S.à r.l. (l'« **Associé Commandité** ») et (ii) plusieurs actionnaires commanditaires dont Monsieur Phil Neuman qui détient 17,82% des actions ordinaires de la Société. Plusieurs actionnaires commanditaires détiennent également des parts sociales de l'Associé Commandité. Or, ceci n'est pas le cas de Phil Neuman qui n'est qu'un associé commanditaire de la Société.

La relation contractuelle entre Phil Neuman et Jose Garcia via ses sociétés (i) Pillo Financial Consulting Corp dans un premier temps et (ii) par la suite Pillo Portsmouth Holding Company LLC (« **Pillo** ») a débuté en 2009. Jose Garcia était alors actionnaire indirect à hauteur de 100 pour cent des actions de la Société.

A titre de clarification, les actions de la Société ont fait objet d'un transfert par la société Pillo Financial Consulting Corp à Pillo en 2011. Les deux sociétés sont détenues intégralement par Jose Garcia, et à l'heure actuelle uniquement Pillo détient encore des actions dans la Société.

Le 24 novembre 2009, Jose Garcia a prévu de vendre à Phil Neuman (i) la moitié des intérêts sociaux détenus dans l'Associé Commandité par Jose Garcia à travers sa société Pillo Consulting Corp (qui jusque-là était l'associé unique de l'Associé Commandité) en contrepartie d'un euro et (ii) la moitié des intérêts sociaux détenues par Pillo Consulting Corp dans la Société en contrepartie d'un euro. En contrepartie, Phil Neuman s'engageait de se consacrer à temps plein dans le but d'assurer une croissance des affaires et des profits (**Pièce n°1 Arendt**). Or, il n'a jamais mis en relations des investisseurs avec la Société ou même joué le rôle d'un acteur actif dans la vie de la Société.

En avril 2010, trois contrats ont été signés entre ces mêmes parties afin de formaliser le transfert des actions de la Société et les parts sociales de l'Associé Commandité :




- un *Stock Transfer Agreement* conclu entre Jose Garcia et Phil Neuman en attendant l'agrément de Phil Neuman par la CSSF. En effet, Phil Neuman aurait dû devenu actionnaire à hauteur de 50% de Pillo Consulting Corp (et par conséquent actionnaire indirect de l'Associé Commandité) contre le paiement d'un euro (**Pièce n°2 Arendt**). La moitié des actions de Pillo Consulting Corp a été consigné en attendant l'agrément de la CSSF. Phil Neuman n'ayant pas pris les mesures nécessaires pour son agrément, ce contrat n'a jamais été exécuté et par conséquent il n'est jamais devenu actionnaire de la Société.

- Un *Share Sale and Purchase Agreement* concernant l'Associé Commandité : Monsieur Neuman aurait dû recevoir la moitié des actions de l'Associé Commandité, à savoir 6.250 parts sociales ordinaires d'une valeur nominale de 6.250 EUR contre le paiement d'un euro (**Pièce n°3 Arendt**). Or, ce contrat n'a jamais été exécuté suivant le défaut de Phil Neuman de fournir la documentation pour les aspects réglementaires. Par conséquent, Phil Neuman n'est jamais devenu actionnaire de la Société. ;

- Un *Share Purchase Agreement* concernant la Société : Phil Neuman devait recevoir la moitié des actions de la Société, à savoir 61.500 actions ordinaires d'une valeur nominale de 61.500 EUR contre le paiement d'un euro (**Pièce n°4 Arendt**). Or, ce contrat n'a jamais été exécuté suivant le défaut de Phil Neuman de fournir la documentation pour les aspects réglementaires et Phil Neuman n'est jamais devenu actionnaire de la Société ;

  (ensemble les « **Contrats de 2009** »). Tous ces contrats étaient soumis au droit de New York (Etats-Unis d'Amérique).

Les Contrats de 2009 (notamment Pièce n°2 Arendt, p1) prévoyaient :

> « *The transfer of Carlisle shares required by the Carlisle Agreement has yet to be completed and remains subject to certain government approvals under the laws of Luxembourg* ».

Traduction française:

> *« Le transfert des actions de Carlisle requis par l'accord de Carlisle [contrat du 24 novembre 2009, Pièce n°1 Arendt] n'a pas encore été réalisé et reste soumis à certaines approbations gouvernementales en vertu des lois du Luxembourg ».*

Il est question de l'agrément de la CSSF.

Or, après la signature des Contrats de 2009, Phil Neuman n'a pas pris les mesures nécessaires pour se faire agréer auprès de la CSSF. Par conséquent, les Contrats de 2009 n'ont jamais été exécutés.

Les Contrats de 2009 avaient pour but de faire progresser le groupe Carlisle. Phil Neuman avait promis d'introduire de nouveaux investisseurs et de se consacrer à plein temps au développement des affaires pour le compte de la Société. C'est uniquement pour ces raisons que Monsieur Garcia a accepté de vendre la moitié de la Société et de l'Associé Commandité pour la valeur d'un euro. Or, Phil Neuman n'a jamais tenu ses promesses. Malgré plusieurs rappels, Phil Neuman trouvait de nouvelles raisons pour expliquer les raisons de son absence dans la vie de la Société. Après un certain moment, il a tout simplement arrêté de répondre aux courriels de Jose Garcia qui gérait alors seul la Société (**Pièce n°5 Arendt**). C'est uniquement grâce aux efforts des administrateurs actifs de la Société tel que Monsieur Garcia et Tim Mol que la société a continué à croitre.

Cependant, Phil Neuman s'est de nouveau manifesté auprès de la Société après une période de plus ou moins un an. Il a menacé de poursuivre la Société en justice si les Contrats de 2009 n'étaient pas exécutés. Jose Garcia qui, au moment des faits, voulait se concentrer sur le développement et la croissance de la Société, a décidé de ne pas être impliqué dans un contentieux qui aurait pu paralyser la Société.

Le 27 avril 2012, Jose Garcia et Phil Neuman ont ainsi acté qu'ils ont eu des différends au sujet de la Société et en même temps ils ont décidé de transiger sur ces différends (au sujet des Contrats de 2009) pour les remplacer par un accord du 27 avril 2012 (la « **Transaction** », **Pièce n°6 Arendt**).

Suivant la Transaction, Phil Neuman est devenu associé commanditaire à hauteur de 20% de la Société, il avait également été convenu que Phil Neuman allait recevoir un contrat d'emploi (afin de garantir qu'il allait s'impliquer cette fois dans la vie de la Société) ainsi qu'un paiement en espèces de 150.000 USD. Phil Neuman n'est ni venu vivre à Luxembourg, ni n'a effectué des tâches salariales. Or, il a quand même perçu un honoraire en tant que consultant (et non pas un salaire en tant qu'employé) de la part de la Société. Cependant, Phil Neuman n'a jamais fourni un service, qu'il mériterait de mentionner, à la Société.

En l'espèce, tous les Contrats de 2009 ont été novés, et en date du 22 mars 2013, le transfert des actions de la Société telle qu'envisagée dans la Transaction a été formalisé : Phil Neuman a reçu 24.800 actions ordinaires dans la Société, de nouveau contre le paiement d'un (1) EUR (le « **Contrat** », **Pièce n°7 Arendt**).

En d'autres mots, à partir de 2013, Monsieur Phil Neuman était uniquement associé commanditaire à hauteur de 20% de la Société.

Il convient de clarifier que Phil Neuman s'est fait agréer auprès de la CSSF en date du 11 janvier 2011 afin de pouvoir devenir un associé de la Société (**Pièce n°8 Arendt**). Or, tel qu'il sera établi ci-après sa déclaration d'honorabilité était mensongère.

Ensuite, le 29 janvier 2019 un acte de vente (*Share Purchase Agreement*), a été conclu par Phil Neuman et les autres associés commanditaires en tant que vendeurs et Carlisle Acquisition Vehicle (ci-après « **CAV** »), LLC en tant qu'acquéreur. Selon les termes de l'acte de vente CAV a fait l'acquisition de 2.520 actions ordinaires de Monsieur Neuman en contrepartie de 6.909.937,50 USD.

A partir de ce moment, Phil Neuman ne détenait plus que 17,82% de la Société.




Phil Neuman a reçu un montant total de 6.718.884,00 EUR en termes de dividendes par la Société (**Pièce n°9 Arendt**) depuis la signature du Contrat.

Il n'a montré aucun intérêt dans la croissance de la Société jusqu'au moment où ses dividendes ont diminué suivant la crise de Covid-19. En date du 4 janvier 2021, Phil Neuman a introduit une procédure de référé probatoire à l'encontre de la Société (**Pièce n°10 Arendt**). Cette procédure est toujours pendante suivant le changement d'avocat par Phil Neuman à trois reprises.

## B. Le comportement inquiétant de Phil Neuman

Phil Neuman a manifesté à plusieurs reprises un comportement inquiétant qui a suscité des inquiétudes auprès de Jose Garcia et la Société.

En effet, la Société et Jose Garcia ont remarqué plusieurs agissements très suspects de la part de Phil Neuman.

### 1. L'utilisation de la dénomination de la Société pour ses propres profits

Dans un premier temps, il convient de clarifier que Phil Neuman n'est pas dans le conseil d'administration de la Société et n'a ainsi aucun pouvoir de décision au sujet de la Société.

Le titre de « *President* » de la Société est un titre honoraire qui résulte de la Transaction (Pièce n°5 Arendt). Il ne s'agit pas une fonction réelle au sein de la Société comme aucun travail n'est en réalité effectué par Phil Neuman.

Or, ceci ne l'a pas dissuadé de se comporter comme un administrateur de la Société envers des tiers. En effet, il semble que Phil Neuman a, à plusieurs reprises, utilisé la Société dans le cadre de transactions personnelles. Le conseil d'administration de la Société n'était ni au courant ni n'a approuvé ces transactions personnes de Phil Neuman.

Ainsi, la Société a été informée que Qualis Care of Louisiana, LLC, une société *limited liability corporation* de droit de Wyoming aurait fait l'objet d'une demande en faillite aux Etats-Unis (**Pièce n°11 Arendt**). Sur les documents, il est fait mention que Qualis Care of Louisiana, LLC, serait une filiale de la Société. Or, Qualis Care of Louisiana, LLC n'est pas une des filiales de la Société.

Il ressort que Phil Neuman aurait, à plusieurs reprises, indiqué aux gens notamment à Monsieur James M. Peddy et que Qualis Care of Louisiana, LLC serait une filiale de la Société (**Pièce n°12 Arendt**).

Il semble que Phil Neuman a profité de son titre de président afin de faire croire à ses cocontractants qu'ils étaient en train de négocier de de conclure des contrats avec une filiale d'une société qui fait l'objet de la supervision de la CSSF. Or, ces sociétés n'étaient pas des filiales de la Société, mais étaient sous contrôle de Phil Neuman.

Ni Pillo, ni la Société a une visibilité complète sur l'utilisation de la Société par Phil Neuman.

En effet, suivant la Transaction, Phil Neuman détient le titre de « *President* » de la Société et figure en tant que tel sur le site web de la Société. Il aurait pu en principe utiliser ce titre en face de cocontractant ignorant alors que Phil Neuman n'a *de facto* aucune fonction autre que celle d'un actionnaire.

2. <u>Le paiement de la caution judiciaire sans autorisation de la société en question</u>

En date du 4 janvier 2021, Phil Neuman a introduit une procédure de référé probatoire à l'encontre de la Société (**Pièce n°13 Arendt**). Auparavant, l'avocat américain de Phil Neuman avait envoyé un projet d'assignation envisagé par Phil Neuman (**Pièce n°14 Arendt**). Ce projet d'assignation n'a pas encore fait l'objet d'une signification, cependant, il montrait le résultat recherché par Phil Neuman.

En effet, Phil Neuman prétendait avoir subi un dommage suite à la perte de valeur des actions de la Société. A cet égard, Phil Neuman demandait toute une liste de documents afin de vouloir calculer cette baisse de valeur. Or, les documents demandés lui n'auraient pas permis d'établir son dommage, mais il s'agissait d'un moyen de pression envers la Société. Cette procédure est toujours pendante étant donné que Phil Neuman a changé à trois reprises son avocat.

Dans le cadre de cette procédure, Phil Neuman a été condamné au paiement d'une caution judiciaire d'un montant de 8.500 EUR. Le virement de la caution judiciaire a été principalement fait par le biais d'une société connue sous la dénomination « Crossing Bridges of The Palm Beaches INC.

Ce paiement semblait étrange comme la société Crossing Bridges of the Palm Beaches est une société sans but lucratif.

L'administrateur de Crossing Bridges of the Palm Beaches, Madame Coretha Smith, s'est dite également très surprise. Elle a d'ailleurs affirmé n'avoir jamais autorisé un tel paiement (**Pièce n°15 Arendt**).

En effet, Madame Coretha Smith a indiqué dans son attestation testimoniale :

*« Philip Neuman did not and does not have permission or authority to use any bank or other financial institutions accounts associated with Crossing Bridges of the Palm Beaches since April 7, 2020, when I was served a letter terminating our agreement from Edward Griffith, of the Griffith Firm ».*

Traduction française:




*« Philip Neuman n'avait pas et n'a pas la permission ou le pouvoir d'utiliser les comptes bancaires ou d'autres institutions financières associées à Crossing Bridges of the Palm Beaches depuis le 7 avril 2020, date à laquelle j'ai reçu une lettre d'Edward Griffith, du cabinet Griffith, mettant fin à notre accord. »*

Elle confirme connaître Phil Neuman et elle est contente de n'avoir plus de relation professionnelle avec ce dernier. En tout état de cause, elle était très stupéfaite de voir Phil Neuman utiliser des fonds qui ne lui appartiennent pas.

3. Le non-respect des exigences KYC de la Société

Par ailleurs, Phil Neuman a demandé le paiement de ses dividendes sur des comptes qui n'indiquent pas son nom, mais qui appartiennent aux différentes entités. Dans un souci de respect des exigences de la législation de la lutte contre le blanchiment de capitaux et le financement du terrorisme, la Société a demandé des informations à l'égard de ces paiements.

A cet égard, il convient de relever le courrier du 11 décembre 2020 de la Société dans laquelle cette dernière demande des clarifications au regard du compte bancaire sur lequel Phil Neuman demande le paiement de ses dividendes, à savoir « Edward Griffith P.C. New York IOLA Attorney Trust Account » (**Pièce n°16 Arendt**).

Phil Neuman s'est montré très agressif envers la Société dans ce contexte et s'est contenté de jouer la victime (**Pièce n°17 Arendt**).

A l'heure actuelle, Phil Neuman n'a jamais expliqué le lien avec ces sociétés.

## C. La découverte des manœuvres frauduleuses de Phil Neuman lors de la conclusion du Contrat

1. Phil Neuman a un long passé judiciaire

Il a été découvert que Phil Neuman détient et utilise plusieurs adresses et plusieurs numéros de sécurité sociale qu'il communique à son gré à ses cocontractants. Ce fait est notamment problématique au stade des contentieux auxquels il intervient en tant que partie défenderesse.

En effet, Phil Neuman est ou était lié dans un nombre important de procédures civiles aux Etats-Unis, au total 48, principalement résultant des impayés de Phil Neuman. Ce qui est problématique est le fait que Phil Neuman a été condamné à l'encontre de plusieurs créanciers, dont le fisc américain, et n'a jamais réglé ses dettes. Phil Neuman crée des sociétés à son gré et se cache derrière ses sociétés et le bénéfice du « *corporate veil* ». Le fait de déposer plusieurs adresses lui permet d'échapper à l'exécution des jugements.

Toutes les personnes contactées à son égard ont donné une image très négative de ce dernier. Il s'agit en effet d'une personne qui promet des choses sans aucune volonté de vouloir (et pouvoir tenir) ses promesses.

2. La déclaration mensongère auprès de la CSSF

Le fait le plus inquiétant est cependant la déclaration d'honorabilité de Phil Neuman auprès de la CSSF.

En effet, il ressort que Phil Neuman a fait l'objet d'une procédure de faillite personnelle aux Etats-Unis en 1994 (**Pièce n°18 Arendt**). Or, dans sa déclaration d'honorabilité, il a déclaré de n'avoir jamais fait l'objet d'une procédure de faillite (Pièce n°7 Arendt).

Depuis cette faillite, Phil Neuman a indirectement été impliqué dans un nombre important de procédures civiles aux Etats-Unis, au total 48 procédures où sa société a toujours été condamnée au paiements des montants dus.

Plus précisément, il ressort de tous les contrats entre Jose Garcia, Pillo et Phil Neuman que les démarches administratives auprès de la CSSF par Phil Neuman et son agrément étaient une condition essentielle au Contrat. Sans cette condition, il n'y a pas le contrat entre les parties ne pouvaient pas être exécuté.

Cette condition d'honorabilité a d'ailleurs été reprise dans la Transaction. Il s'agit dès lors clairement d'un contrat *intuitu personae* et la personne du cocontractant était essentielle pour Jose Garcia et Pillo. En effet, il ressort de la Transaction :

7. PN will receive 20% of shares in Carlisle. PN understands that since Carlisle is a company regulated by the CSSF, prior approval of the CSSF is needed before the share transfer, Agreements can be executed. T.H. Mol will handle mentioned approval process with the CSSF; this will be completed within 120 Days.

Traduction française :

> « *[Phil Neuman] recevra 20% des actions de [la Société]. [Phil Neuman] comprend que puisque Carlisle est une société réglementée par la CSSF, l'approbation préalable de la CSSF est nécessaire avant que les accords de transfert d'actions puissent être exécutés. [Tim Mol] s'occupera de la procédure d'approbation mentionnée auprès de la CSSF ; celle-ci sera achevée dans les 120 jours.* »

A titre de clarification, le Contrat est la formalisation du point 7 de la Transaction. Par ailleurs, Phil Neuman avait préparé sa déclaration d'honorabilité avant la signature de la Transaction et du Contrat, probablement après les Contrats de 2009.

Tout d'abord, avant la conclusion du Contrat, Phil Neuman a rempli une déclaration d'honorabilité mensongère.

En effet, Phil Neuman a rempli :




**I, the undersigned,** Phil Neuman **declare on my honour:**

a) never having been subject or currently not being subject to bankruptcy, insolvency, moratorium, controlled management, suspension of payments, court ordered liquidation or reorganisation or any similar procedure affecting the rights of creditors generally,

b) never having been or currently not being a director, a manager, administrator or having a significant influence in a company, legal person or any other legal entity which has been subject or is subject to bankruptcy, insolvency, moratorium, controlled management, suspension of payments, court ordered liquidation or reorganisation or any similar procedure affecting the rights of creditors generally, or which had or has currently any significant influence on a company subject to these proceedings;

Or, il ressort que Phil Neuman a fait l'objet d'une faillite en nom personnelle en 1994. Par ailleurs, plusieurs de ses sociétés sont également en défaut de paiement ou ont fait l'objet de faillite, à savoir Geller Ltd en 1993, Dr Corporation Corp en 2003 et United National Funding LLC en 2014.

Par ailleurs, il l'a fait en toute connaissance de cause. En effet, il résulte des Contrats de 2009 qu'il ne pourra pas accéder à l'actionnariat de la Société sans l'agrément de la CSSF. Il ne peut pas être exclu que ce n'est que pour cette raison que Phil Neuman n'avait pas entrepris les démarches administratives au moment des Contrats de 2009.

Par ailleurs dans la déclaration d'honorabilité, il est précisé que :

By signing this declaration of honour, the undersigned commits to inform the CSSF without delay in case one of the elements covered by this declaration was to change in the future.

The undersigned recognises and accepts that if this declaration becomes or is incorrect, his/her professional propriety/repute shall be compromised.

By signing this declaration of honour, the undersigned commits to deal with the CSSF in an open and cooperative way and to disclose appropriately and actively any information of which the CSSF would reasonably expect notice.

| | |
|---|---|
| Place of signature | NYC , NY |
| Date of signature | 7 August 2012 |
| Signature | |

Il était ainsi au courant du fait que toute déclaration fausse pourra heurter sa réputation et impacter sa capacité de devenir actionnaire dans une société réglementée.

## II. <u>EN DROIT</u>

### A. A titre principal : la nullité du Contrat soit pour contrariété à l'ordre public, soit pour dol, soit pour erreur

#### 1. Nullité du Contrat pour contrariété à l'ordre public

Le Contrat est nul pour contrariété à l'ordre public.

En effet, conformément à l'article 1133 du Code civil « *la cause est illicite, quand elle est prohibée par la loi, quand elle est contraire aux bonnes mœurs ou à l'ordre public* » et il résulte de l'article 1131 du Code Civil que « *l'obligation sans cause, ou sur une fausse cause, ou sur une cause illicite, ne peut avoir aucun effet* ».

Un contrat avec une cause illicite est ainsi nul.

Ainsi, il convient de se référer au sous-chapitre 2.1. de la circulaire n°18/698 de la CSSF :

*« 5. La CSSF n'accorde l'agrément à un GFI que si elle a obtenu communication de l'identité des actionnaires ou associés, directs et indirects, personnes physiques ou morales, qui détiennent une participation qualifiée, et du montant de cette participation. La CSSF doit être satisfaite qu'un détenteur d'une participation qualifiée remplisse les conditions d'honorabilité et dispose des qualités requises pour exercer ses pouvoirs de manière à ce que soit assurée une gestion saine et prudente du GFI (articles 103 (1) de la Loi 2010 et 7 (1) d) de la Loi 2013).*

*6. Par ailleurs, il est exigé que la structure de l'actionnariat direct et indirect, en ce compris les personnes avec lesquelles le GFI entretient des liens étroits, soit clairement déterminée et organisée de telle façon que la CSSF puisse exercer sa surveillance sans entrave (articles 102 (2) de la Loi 2010 et 7 (3) de la Loi 2013).*

*7. La notion de gestion saine et prudente est appréciée à la lumière des critères d'évaluation énoncés au chapitre 3 des orientations communes de l'AEMF, de l'ABE, et de l'AEAPP relatives à l'évaluation prudentielle des acquisitions et des augmentations de participations qualifiées dans des entités du secteur financier (ci-après « les Orientations Communes »).*

*Les cinq critères sont :*

- ***la réputation /l'honorabilité professionnelle du candidat acquéreur ;***
- ***la réputation/l'honorabilité et l'expérience professionnelles de ceux qui dirigeront l'activité du GFI ;***
- *la solidité financière du candidat acquéreur ;*
- *le respect des exigences prudentielles du GFI ;*
- ***l'absence de soupçon de blanchiment de capitaux ou de financement du terrorisme par le candidat acquéreur.*** » (nous soulignons).

Etant donné que tout l'agrément de Phil Neuman auprès de la CSSF est basé sur une fausse déclaration d'honorabilité de Phil Neuman, présentée par ce dernier à Pillo et Jose Garcia avant la conclusion du Contrat, Phil Neuman n'était jamais en mesure de devenir un actionnaire dans une société telle que la Société qui est réglementée par la CSSF.

Il est par ailleurs évident que les faits exposés ci-dessus constituent une fraude et il convient donc également de faire applicable du principe général de droit « *fraus omnia corrumpit* » qui prohibe toute tromperie ou déloyauté dans le but de nuire ou de réaliser un gain.

Le Contrat est sans cause et partant nul.

2. Nullité du Contrat pour dol

L'article 1116 du Code civil dispose que :

> *« Le dol est une cause de nullité de la convention lorsque les manœuvres pratiquées par l'une des parties sont telles qu'il est évident que, sans ces manœuvres, l'autre partie n'aurait pas contracté.*

*Il ne se présume pas, et doit être prouvé.* »

« *Le dol consiste en une discordance entre la volonté réelle et la volonté déclarée provoquée par des manœuvres frauduleuses.*

*Il exige la réunion de deux éléments, l'un élément matériel et l'autre intentionnel. L'élément matériel du dol correspond à des manœuvres mais il peut aussi s'agir d'un simple mensonge ou d'une réticence motivés par l'intention de tromper le cocontractant. L'élément intentionnel exige que l'auteur du dol ait agi intentionnellement, non pas pour causer un préjudice, mais pour tromper le cocontractant en suscitant l'erreur ou en profitant de celle-ci. Il doit partant avoir eu connaissance de la circonstance qu'on lui reproche d'avoir tue* »[1].

Il s'avère qu'il s'agirait du mode opératoire classique de Phil Neuman. Il contacte des sociétés et promet de mettre en relation ces sociétés avec des investisseurs potentiels. Or, il a un long passé judiciaire et une fois actionnaire de ces sociétés, il commence à les mettre sous pression et profiter des dividendes sans pour autant fournir le travail promis.

Phil Neuman s'est vendu comme une personne de confiance qui a des relations dans le domaine des assurances-vie. Or, il n'en est rien.

Par ailleurs, Phil Neuman avait rempli la déclaration d'honorabilité de la CSSF, après la signature des Contrats de 2009 et avant la signature de la Transaction et du Contrat.

Il était ainsi au courant que la condition essentielle de son honorabilité n'était pas remplie au moment de la conclusion de la Transaction et du Contrat. Il ressort clairement de la déclaration d'honorabilité de Phil Neuman que ce dernier a menti à Pillo et Jose Garcia, sinon omis de dire la vérité à Jose Garcia et Pillo.

Il est de jurisprudence constante que « *Le dol est une cause de nullité de la convention lorsque les manœuvres pratiquées par l'une des parties sont telles qu'il est évident que sans ces manœuvres l'autre partie n'aurait pas contracté. Aux manœuvres proprement dites sont assimilés le mensonge et la réticence* »[2].

En effet, Jose Garcia et Pillo n'auraient jamais conclu les Contrats de 2009, la Transaction ou le Contrat avec Phil Neuman s'ils avaient eu connaissance de sa faillite en nom personnel, notamment parce que cela pourrait s'avérer fatal pour la Société et sa réputation.

Par ailleurs, Phil Neuman a prétendu posséder un portefeuille d'investisseurs à rapporter à la Société. Ceci n'est également pas vrai. Phil Neuman ne détient également aucune qualification professionnelle dans ce domaine.

L'élément matériel et l'élément moral du dol sont dès lors donnés.

La demande en nullité du Contrat pour dol de Jose Garcia et la société Pillo est dès lors justifiée et fondée.

---

[1] Cour d'appel 16 décembre 2015, Pas. 37, p.835.
[2] Cour d'appel 7 février 2007, Pas.33 p.397.

3. <u>La nullité du Contrat pour erreur</u>

Si par impossible, Votre tribunal, retiendrait que le mensonge et/ou la réticence de Phil Neuman au moment de la conclusion de la Transaction et du Contrat ne constitue pas un dol, il y a partant à retenir une erreur sur la personne de Phil Neuman.

Conformément à l'article 1109 du Code civil « *Il n'y a point de consentement valable si le consentement n'a été donné que par erreur ou s'il a été extorqué par violence ou surpris par dol* ».




L'article 1110 du Code civil dispose que :

« *L'erreur n'est une cause de nullité de la convention que lorsqu'elle tombe sur la substance même de la chose qui en est l'objet.*

*Elle n'est point une cause de nullité, lorsqu'elle ne tombe que sur la personne avec laquelle on a l'intention de contracter, à moins que la considération de cette personne ne soit la cause principale de la convention* ».

Il est évident que la personne du cocontractant et son honorabilité était une condition essentielle du Contrat. Ceci résulte d'ailleurs suivant la non-exécution des Contrats de 2009 étant donné que les démarches d'agrément n'avaient pas été entreprises par Phil Neuman. Les actions de la Société et les parts sociales de l'Associé Commandité n'ont jamais été transférées à Phil Neuman.

En tout état de cause, Jose Garcia croyait légitimement qu'il contractait avec une personne honorable et ayant d'expérience dans le domaine des assurances-vie. Ceci découle d'ailleurs du contrat initial datant du 24 novembre 2009, la coopération et la recherche actives étaient les conditions essentielles de cette relation entre Jose Garcia et Phil Neuman.

Jose Garcia n'était pas au courant au moment de la conclusion des Contrats de 2009 ou du Contrat que Phil Neuman a fait l'objet d'une faillite personnel au Etats-Unis, et qui a au total 48 jugements contre lui sur son compte.

Par ailleurs, au moment de la conclusion des Contrats de 2009, Jose Garcia croyait être en face d'une personne ayant une certaine expérience et possédant un portefeuille de clientèle qui investissent dans le domaine des assurances-vie. Or, ceci s'est avéré faux. Phil Neuman n'est tout simplement pas la personne qu'il prétendait être. En effet, Phil Neuman n'a jamais travaillé en vue de faire progresser la Société. Le seul élément qui l'intéressait était d'encaisser les dividendes distribués par la Société.

Cependant au moment de la signature des Contrats de 2009 et du Contrat, Jose Garcia croyait légitimement avoir un nouveau partenaire honorable qui allait l'aider pour faire progresser la Société. Il y a dès lors erreur sur la personne de Phil Neuman.

En tout état de cause, les Contrats de 2009, la Transaction ainsi que le Contrat sont tous des contrats *intuitu personae*. Jose Garcia et Pillo avaient une certaine croyance aux dires de Phil Neuman. Ceci ressort clairement de la contrepartie d'un euro symbolique. La personne du

cocontractant était dès lors importante pour Jose Garcia. Il était d'accord de donner gratuitement la moitié de la Société au moment des Contrats de 2009 et 20% au moment du Contrat pour le progrès de la Société.

En l'espèce, si Pillo avait su au moment de la conclusion du Contrat que Phil Neuman n'est pas une personne de confiance, qu'il a déjà fait l'objet d'une faillite personnelle et qu'il n'envisage pas de travailler en vue de la croissance de la Société, elle n'aurait jamais conclu le Contrat avec Phil Neuman.

Si par impossible Votre tribunal ne retiendrait pas la nullité du Contrat pour contrariété à l'ordre public ou pour dol, alors il convient de retenir la nullité du Contrat pour erreur sur base de l'article 1109 du Code civil.

4. <u>Effets de la nullité du Contrat</u>

a. *Quant à la nullité pour contrariété à l'ordre public*

La conséquence pour contrariété à l'ordre public est la nullité absolue du Contrat.

b. *Quant à la nullité relative au dol / à l'erreur*

Ce n'est qu'en 2021 que Pillo s'est rendue compte qu'elle est en face à une personne qui a menti à la CSSF. En cas d'erreur ou de dol, la prescription de 5 ans ne court que du jour où ils ont été découverts (Article 1304 du Code civil). Pillo agit ainsi dans les délais.

Dès lors, la sanction du dol, sinon de l'erreur tel que développé ci-dessus est la nullité du Contrat.

c. *Conséquences légales de la nullité pour les parties en cause*

Chacune des parties doit ainsi restituer à l'autre ce qu'elle a reçu en exécution du contrat annulé.

Il en ressort que Phil Neuman doit rembourse à Pillo (i) 22.280 actions de Carlisle Management Company S.C.A. pour lesquelles il figure sur le registre d'actionnaires ainsi que (ii) le produit de la vente des 2.520 actions par Phil Neuman à CAV, à savoir 6.909.937,50 USD.

Pillo doit rembourser 1 EUR à Phil Neuman.

Il convient dès lors d'appliquer la compensation entre la créance de Phil Neuman et la créance de Pillo sur base de l'article 1289 du Code civil et d'ordonner à Phil Neuman le paiement de 5.866.846,88 EUR (résultant de la soustraction d'1 EUR du montant 6.909.937,50 USD (évalué provisoirement à 5.866.847,88 EUR avec un taux de change de 1 USD = 0,85 EUR)).

Il convient également d'ordonner le remboursement des dividendes perçus par Phil Neuman au cours de ces dernières années, savoir 6.718.884,00 EUR.

**B. A subsidiaire : la résolution judiciaire du Contrat**

A titre subsidiaire, il convient de retenir la résolution judiciaire du Contrat.

Conformément à l'article 1184 du Code civil :




> « *La condition résolutoire est toujours sous-entendue dans les contrats synallagmatiques, pour le cas où l'une des deux parties ne satisfera point à son engagement.*
>
> *Dans ce cas, le contrat n'est point résolu de plein doit. La partie envers laquelle l'engagement n'a point été exécuté a le choix ou de forcer l'autre à l'exécution de la convention lorsqu'elle est possible, ou d'en demander la résolution avec dommages et intérêts.*
>
> *La résolution doit être demandée en justice, et il peut être accordé au défendeur un délai selon les circonstances* ».

Il ressort des développements ci-dessus que Phil Neuman n'a pas reçu les actions de la Société que pour un euro symbolique et sans aucune autre contrepartie. En effet, ce dernier devait participer au développement de la Société et faire progresser la Société.

Dans le contrat du 24 novembre 2009, il est clairement indiqué que

« *Neuman and Garcia will devote their best efforts, on a full time basis, to the Company [l'Associé Commandité et la Société] and the business thereof with the objective of growing the business and the profits derived therefrom including but not limited to, taking an official management role in the business, performing business development functions, actively finding investors (in cash or in kind) for the long term growth fund, and eventually bringing in additional business opportunities to the Company* ».

<u>Traduction française :</u>

« *Neuman et Garcia consacreront leurs meilleurs efforts, à temps plein, à la Société [l'Associé Commandité et la Société] et à ses activités dans le but de développer l'entreprise et les bénéfices qui en découlent, y compris, mais sans s'y limiter, en assumant un rôle officiel de gestion dans l'entreprise, en exerçant des fonctions de développement commercial, en trouvant activement des investisseurs (en espèces ou en nature) pour le fonds de croissance à long terme et en apportant éventuellement des opportunités commerciales supplémentaires à la Société.* ».

Or, il ne s'est jamais investi dans la croissance de la Société.

Malgré plusieurs relaces par Jose Garcia, Phil Neuman n'a pas participé au développement de la Société. Le seul élément qui l'intéressait était de d'encaisser des dividendes alors que son partenaire Jose Garcia a dû injecter 1 millions d'EUR dans la Société.

Par ailleurs, Phil Neuman n'a pas déménagé vers le Luxembourg alors que ceci avait été convenu entre les parties dans la Transaction afin de garantir la bonne gestion de la Société.

Dès lors, Phil Neuman n'a pas rempli ses obligations contractuelles et il convient de retenir la résolution judiciaire du Contrat.

Les effets de la résolution judiciaire sont les mêmes que ceux de la nullité décrits ci-dessus.

## C. Indemnité de procédure

Au vu de ce qui précède, Pillo sollicite que Phil Neuman soit condamné à lui payer une indemnité de procédure de 100.000 EUR, sur le fondement de l'article 240 du Nouveau Code de Procédure civile, alors qu'il serait inéquitable de laisser à sa charge l'entièreté des frais non compromis dans les dépens.

## A CES CAUSES

les parties défenderesses voir recevoir la présente demande en la forme;

au fond l'entendre déclarer fondée et justifiée ;

a titre principal, déclarer nul le contrat du 22 mars 2013 conclu entre Phil Neuman et Pillo Portsmouth Holding Company, LLC ;

à titre subsidiaire, ordonner la résolution judiciaire du contrat du 22 mars 2013 conclu entre Phil Neuman et Pillo Portsmouth Holding Company, LLC ;

partant :

condamner Phil Neuman de rembourser à Pillo Portsmouth Holding Company, LLC (i) les 22.280 actions de Carlisle Management Company S.C.A. et (ii) le produit de la vente des 2.520 actions par Phil Neuman à Carlisle Acquisition Vehicle, à savoir 6.909.937,50 USD,;

ordonner à Pillo Portsmouth Holding Company, LLC de rembourser à Phil Neuman 1 EUR ;

déclarer qu'il y a lieu d'appliquer la compensation entre la créance de Pillo Portsmouth Holding Company, LLC de 6.909.937,50 USD et la créance de Phil Neuman d'1 EUR ;

partant ordonner à Phil Neuman le paiement de 5.866.846,88 EUR (résultant de la soustraction d'1 EUR du montant 6.909.937,50 USD (évalué provisoirement à 5.866.847,88 EUR avec un taux de change de 1 USD = 0,85 EUR)) ;

ordonner à Phil Neuman de payer.718.884,00 EUR perçus de la part de Carlisle Management Company, S.C.A. en termes de dividendes reçus, à Pillo Portsmouth Holding Company, LLC;

voir déclarer le jugement a intervenir commun à la partie Carlisle Management Company S.C.A. ;




condamner Phil Neuman à tous les frais et dépens de l'instance avec distraction au profit de l'avocat à la Cour comparant qui affirme en avoir fait l'avance ;

condamner Phil Neuman à payer une indemnité de procédure d'un montant de EUR 100.000 sur base de l'article 240 du Nouveau Code de procédure civile à Pillo Portsmouth Holding Company, LLC , dès lors qu'il serait inéquitable de laisser à la seule charge des parties demanderesses les frais exposés par elle non compris dans les dépens, tels notamment les frais d'avocat ;

ordonner l'exécution provisoire du jugement à intervenir nonobstant appel et sans caution ;

réserver aux parties demanderesses tous autres droits, dus, moyens et actions.

Dont acte et attendu que la partie assignée sub 1) réside professionnellement aux Etats-Unis, j'ai adressé, deux copies de l'acte avec traduction en langue anglaise, par lettre recommandée avec avis de réception, à l'autorité centrale territorialement compétente :

***ABC Legal Services***
***633 Yesler Way***
***Seattle, WA 98104***
***USA***

afin que cet acte soit signifié ou notifié conformément à la Convention relative à la signification et la notification à l'étranger des actes judiciaires et extrajudiciaires en matière civile ou commerciale, signée à La Haye le 15 novembre 1965, et pour autant que de besoin, j'ai adressé une copie de l'acte avec traduction en langue anglaise, par lettre recommandée avec avis de réception, à ce destinataire.

COUT DE L'ACTE

Droit:180,00
Voy. : 20,00
Adres: 14,40
Timb.: 76,00
Enreg: 12,00
TVA : 36,45
TOTAL: 338,85

Copie: 72,00
TVA : 12,24
Port : 36,50
TOTAL: 459,59

ETUDE Carlos CALVO
HUISSIERS DE JUSTICE ASSOCIÉS
Luxembourg

HUISSIERS DE JUSTICE
Carlos CALVO
Frank SCHAAL

L-1461 LUXEMBOURG • 65, rue d'Eich (Adr. Postale : B.P.2625 • L-1026 Luxembourg)

# COMPLAINT BEFORE THE DISTRICT COURT OF AND IN LUXEMBOURG

271450 / AK / **A68652**

In the year two thousand and twenty-one, on -04- october

At the request of :

1) **Pillo Portsmouth Holding Company, LLC** , a *limited liability corporation* incorporated under the laws of the State of Delaware, having its principal place of business at 251 Little Falls Drive, Wilmington, New Castle, 19808 Delaware, United States of America, registered in the Delaware Division of Corporation under number 4211817, represented for the purposes hereof by its currently serving Board of Directors, or its duly authorized representative(s) currently serving (hereinafter "**Pillo**");

otherwise, and as far as necessary,

2) **Jose Esteban Casares Garcia**, *chief executive officer,* residing professionally at 9 rue Sainte Zithe, 1st floor, L-2763 Luxembourg (hereinafter "**Jose Garcia**") in his capacity as manager and sole shareholder of Pillo ;

which are represented by **Arendt & Medernach,** a public limited company (société anonyme) registered with the Luxembourg Bar, established and having its registered office at L-1855 Luxembourg, 41A, Avenue J.F. Kennedy, registered in the Luxembourg Trade and Companies Register under number B186371, represented for the purposes of the present document by **Maître François Kremer**, barrister, residing professionally in Luxembourg; Arendt & Medernach at the registered office of which an address for service has been given;

I, the undersigned* **Carlos CALVO / Frank SCHAAL**, Huissier de Justice, residing at L-1461 LUXEMBOURG, 65, rue d'Eich, registered at the Tribunal d'arrondissement de and in Luxembourg
*{* ☑ Laura GEIGER, ☐ Christine KOVELTER, ☐ Kelly FERREIRA SIMOES, substitute judicial officer, in place of} (this paragraph shall be deemed to be unwritten if it is not ticked)*

have issued a summons to:

1) **Mr. Philip Neuman**, born on March 26, 1965 in New York, United States of America, residing professionally at 1000 North Green Valley Parkway Suite 440 Unit 396, Henderson, Nevada 89074, United States of America (hereinafter "**Phil Neuman**");

2) the limited partnership with shares **CARLISLE MANAGEMENT COMPANY S.C.A.** established and having its registered office at L-2763 Luxembourg, 9, rue Sainte-Zithe, registered with the Luxembourg Trade and Companies Register under number B144257, represented by its currently serving managing general partner;

to appear before the Luxembourg District Court, sitting in commercial matters, but in accordance with civil procedure, at the Cité judiciaire, Plateau du Saint-Esprit, L-2080 Luxembourg, within the period prescribed by law, which is fifteen years, in addition to any time-limits for distance;

with the mention that if the service of the summons is made in person and the defendant does not appear, the judgement to intervene will be deemed to be contradictory and is not subject to opposition, but only to appeal, in accordance with articles 79 and 80 of the New Code of Civil Procedure;

**for :**

## I. FACTS AND RETROACTS

### A. The contractual relationship between Pillo and Mr. Neuman

Carlisle Management Company S.C.A. (the "**Company**") is a partnership limited by shares which is a management company within the meaning of Chapter 16 of the Law of 10 December 2010 relating to undertakings for collective investment as well as an alternative investment fund manager within the meaning of the Law of 12 July 2013 relating to alternative investment fund managers. It invests in life insurance. The Company is supervised by the *Commission de Surveillance du Secteur Financier* (the "**CSSF**").

The Company currently has approximately EUR 2.3 billion of assets under management.

The Company has (i) one general partner, Carlisle Investment Group S.à r.l., a limited liability company (the "General Partner") and (ii) several limited partners, Mr. Phil Neuman, who holds 17.82% of the Company's common shares. Several limited shareholders also hold shares in the General Partner. However, this is not the case with Phil Neuman who is only a limited partner of the Company.

The contractual relationship between Phil Neuman and Jose Garcia through his companies (i) Pillo Financial Consulting Corp initially and (ii) subsequently Pillo Portsmouth Holding Company LLC ("**Pillo**") began in 2009. Jose Garcia was then an indirect shareholder of 100 percent of the Company's shares.

By way of clarification, the Company's shares were transferred by Pillo Financial Consulting Corp to Pillo in 2011. Both companies are wholly owned by Jose Garcia, and currently only Pillo still holds shares in the Company.

On November 24, 2009, Jose Garcia planned to sell to Phil Neuman (i) half of the corporate interests held in the General Partner by Jose Garcia through his company Pillo Consulting

Corp (which until then had been the sole partner of the General Partner) for one euro and (ii) half of the corporate interests held by Pillo Consulting Corp in the Company for one euro. In return, Phil Neuman undertook to devote himself full time to ensuring business growth and profits (**Arendt Exhibit 1**). However, he never introduced investors to the Company or even played an active role in the life of the Company.

In April 2010, three contracts were signed between these same parties in order to formalize the transfer of the Company's shares and the General Partner's shares:

- a *Stock Transfer Agreement* concluded between Jose Garcia and Phil Neuman while waiting for the approval of Phil Neuman by the CSSF. Indeed, Phil Neuman should have become shareholder up to 50% of Pillo Consulting Corp (and consequently indirect shareholder of the General Partner) against the payment of one euro (**Exhibit 2 Arendt**). Half of the shares of Pillo Consulting Corp were consigned while waiting for the approval of the CSSF. As Phil Neuman did not take the necessary steps for its approval, this contract was never executed and consequently hé never became a shareholder of the Company.

- A *Share Sale and Purchase Agreement* concerning the General Partner: Mr. Neuman should have received half of the shares of the General Partner, i.e. 6,250 ordinary shares with a par value of EUR 6,250 in exchange for the payment of one euro (**Arendt Exhibit 3**). However, this contract was never executed following Phil Neuman's failure to provide the documentation for the regulatory aspects. Consequently, Phil Neuman never became a shareholder of the Company;

- A *Share Purchase Agreement* concerning the Company: Phil Neuman was to receive half of the Company's shares, i.e. 61,500 ordinary shares with a par value of EUR 61,500 in exchange for the payment of one euro (**Arendt Exhibit 4**). However, this agreement was never executed following Phil Neuman's failure to provide documentation for regulatory purposes and Phil Neuman never became a shareholder of the Company;

  (together the "**2009 Contracts"**). All such contracts were governed by the laws of New York (United States of America).

The 2009 Contracts (including Exhibit 2 Arendt, p1) provided:

> *"The transfer of Carlisle shares required by the Carlisle Agreement has yet to be completed and remains subject to certain government approvals under the laws of Luxembourg.*

French translation:

> "*The transfer of the Carlisle shares required by the Carlisle Agreement [November 24, 2009 contract, Arendt Exhibit No. 1] has not yet been completed and remains subject to certain governmental approvals under Luxembourg law.*"

It refers to the CSSF's approval.

However, after the 2009 Contracts were signed, Phil Neuman did not take the necessary steps to be approved by the CSSF. As a result, the 2009 Contracts were never executed.

The 2009 Contracts were intended to bring the Carlisle Group forward. Phil Neuman had promised to bring in new investors and to devote himself full time to developing the business on behalf of the Company. It was only for these reasons that Mr Garcia agreed to sell half of the Company and of the General Partner for the value of one euro. However, Phil Neuman never kept his promises. Despite several reminders, Phil Neuman found new reasons to explain his absence from the life of the Company. After a while, he simply stopped answering the emails of Jose Garcia who was then managing the Company alone (**Exhibit 5 Arendt**). It was only through the efforts of active directors of the Company such as Mr. Garcia and Tim Mol that the Company continued to grow.

However, Phil Neuman has come forward again after a period of about a year. He threatened to sue the Company if the 2009 Contracts were not enforced. Jose Garcia, who at that time wanted to focus on the development and growth of the Company, decided not to get involved in litigation that could have paralyzed the Company.

On April 27, 2012, Jose Garcia and Phil Neuman thus acknowledged that they had disputes about the Company and at the same time agreed to settle those disputes (about the 2009 Contracts) in lieu of an April 27, 2012 agreement (the "**Settlement**," **Arendt Exhibit 6**).

As a result of the Settlement, Phil Neuman became a 20% limited partner of the Company, it was also agreed that Phil Neuman would receive an employment contract (to ensure that he would be involved in the life of the Company this time) and a cash payment of USD 150,000. Phil Neuman neither came to live in Luxembourg nor did he perform any salaried tasks. However, he did receive a fee as a consultant (and not a salary as an employee) from the Company. Phil Neuman never provided any service to the Company that would be worth mentioning.

In the present case, all of the 2009 Contracts were novated, and as of March 22, 2013, the transfer of the Company's shares as contemplated in the Settlement was formalized: Phil Neuman received 24,800 common shares in the Company, again in exchange for the payment of one (1) EUR (the "**Agreement**", **Exhibit 7 Arendt**).

In other words, as of 2013, Mr. Phil Neuman became a 20% limited partner of the Company.

It should be clarified that Phil Neuman applied to the CSSF on January 11, 2011 to become a partner of the Company (**Exhibit 8 Arendt**). However, as will be established below, his declaration of honoor was untrue.

Subsequently, on January 29, 2019 a *Share Purchase Agreement*, was entered into by Phil Neuman and the other limited partners as sellers and Carlisle Acquisition Vehicle (hereinafter "**CAV**"), LLC as purchaser. Under the terms of the Share Purchase Agreement, CAV acquired 2,520 shares of Mr. Neuman's shares for the amount of USD 6,909,937.50.

As of that moment, Phil Neuman held only 17.82% of the Company.

Phil Neuman has received a total amount of EUR 6,718,884.00 in dividends from the Company (**Exhibit 9 Arendt**) since the signing of the Agreement.

He showed no interest in the growth of the Company until his dividends declined following the Covid-19 crisis. As of January 4, 2021, Phil Neuman filed an evidentiary summary proceeding against the Company (**Arendt Exhibit 10**). This proceeding is still pending following Phil Neuman's change of counsel on three occasions.

## B. Phil Neuman's disturbing behaviour

Phil Neuman has exhibited a number of disturbing behaviours that have raised concerns with Jose Garcia and the Company.

Indeed, the Society and Jose Garcia have noticed several very suspicious actions on the part of Phil Neuman.

1. <u>The use of the Company's name for its own profit</u>

First, it should be clarified that Phil Neuman is not on the board of directors of the Company and thus has no decision-making power with respect to the Company.

The title of "*President*" of the Company is an honorary title resulting from the Settlement (Arendt Exhibit 5). It is not an actual position within the Company as no work is actually performed by Phil Neuman.

However, this did not restrain him from acting as a director of the Company towards third parties. Indeed, it appears that Phil Neuman has, on several occasions, used the Company for personal transactions. The Company's board of directors was neither aware of nor approved of these personal transactions by Phil Neuman.

Thus, the Company was informed that Qualis Care of Louisiana, LLC, a Wyoming *limited liability corporation*, had filed for bankruptcy in the United States (**Arendt Exhibit 11**). The documents mention that Qualis Care of Louisiana, LLC is a subsidiary of the Company. However, Qualis Care of Louisiana, LLC is not a subsidiary of the Company.

It appears that Phil Neuman has, on several occasions, indicated to people, in particular to Mr. James M. Peddy, that Qualis Care of Louisiana, LLC would be a subsidiary of the Company (**Arendt Exhibit 12**).

It appears that Phil Neuman took advantage of his title of president to lead his co-contractors to believe that they were negotiating and concluding contracts with a subsidiary of a company that is subject to the supervision of the CSSF. However, these companies were not subsidiaries of the Company, but were controlled by Phil Neuman.

Neither Pillo nor the Company has full visibility into Phil Neuman's use of the Company. Indeed, according to the Settlement, Phil Neuman holds the title of "*President*" of the Company and

appears as such on the Company's website. He could in principle have used this title in front of an unaware co-contractor, whereas Phil Neuman has *de facto* no function other than that of a shareholder.

2. Payment of the court bond without the authorization of the company in question

As of January 4, 2021, Phil Neuman filed a discovery summary proceeding against the Company (**Arendt Exhibit 13**). Previously, Phil Neuman's U.S. counsel had sent a draft summons contemplated by Phil Neuman (**Arendt Exhibit 14**). This draft summons has not yet been served, however, it showed the result sought by Phil Neuman.

Indeed, Phil Neuman claimed to have suffered damages as a result of the loss in value of the Company's shares. In this respect, Phil Neuman requested a whole list of documents in order to calculate this decrease in value. However, the documents requested would not have allowed him to establish his damages, but it was a means of pressure against the Company. This procedure is still pending, as Phil Neuman has changed his lawyer on three occasions.

As part of these proceedings, Phil Neuman was ordered to pay a judicial bond in the amount of EUR 8,500. The transfer of the judicial bond was mainly made through a company known as "Crossing Bridges of The Palm Beaches INC".

This payment seemed strange as Crossing Bridges of the Palm Beaches is a non-profit corporation.

The administrator of Crossing Bridges of the Palm Beaches, Ms. Coretha Smith, also expressed great surprise. She stated that she had never authorized such a payment (**Arendt Exhibit 15**).

Indeed, Ms. Coretha Smith stated in her testimonial:

*"Philip Neuman did not and does not have permission or authority to use any bank or other financial institutions accounts associated with Crossing Bridges of the Palm Beaches since April 7, 2020, when I was served a letter terminating our agreement from Edward Griffith, of the Griffith Firm.*

French translation:

*"Philip Neuman did not and does not have permission or authority to use bank accounts or other financial institutions associated with Crossing Bridges of the Palm Beaches since April 7, 2020, when I received a letter from Edward Griffith of Griffith Law Firm terminating our agreement."*

She confirmed that she knew Phil Neuman and was glad that she no longer had a professional relationship with him. In any event, she was very surprised to see Phil Neuman using funds that did not belong to him.

3. Failure to comply with the Company's KYC requirements

In addition, Phil Neuman has requested payment of his dividends into accounts that do not indicate his name, but which belong to different entities. In order to comply with the requirements of anti-money laundering and anti-terrorist financing legislation, the Company has requested information regarding these payments.

In this respect, it is worth noting the letter dated December 11, 2020 from the Company in which the latter requests clarification regarding the bank account to which Phil Neuman is requesting payment of his dividends, namely "Edward Griffith P.C. New York IOLA Attorney Trust Account" (**Arendt Exhibit 16**).

Phil Neuman was very aggressive towards the Company in this context and was content to play the victim (**Arendt Exhibit 17**).

At present, Phil Neuman has never explained the connection with these companies.

## C. The discovery of Phil Neuman's fraudulent manoeuvres at the time the Agreement was concluded

1. Phil Neuman has a long history in the courts

It has been discovered that Phil Neuman holds and uses several addresses and social security numbers which he communicates to his co-contractors as he pleases. This is particularly problematic at the stage of litigation in which he intervenes as a defendant.

Indeed, Phil Neuman is or was involved in a significant number of civil proceedings in the United States, a total of 48, mainly resulting from Phil Neuman's unpaid debts. What is problematic is the fact that Phil Neuman has been order to pay in relation to several creditors, including the US tax authorities, and has never settled his debts. Phil Neuman creates companies at will and hides behind his companies and the benefit of the "corporate veil". Filing multiple addresses allows him to avoid the enforcement of judgments.

All the people contacted about him gave a very negative image of him. He is indeed a person who promises things without any willingness (and ability) to keep his promises.

2. Misrepresentation to the CSSF

The most worrying fact, however, is Phil Neuman's declaration of honour to the CSSF.

Indeed, it appears that Phil Neuman was the subject of a personal bankruptcy procedure in the United States in 1994 (**Arendt Exhibit 18**). However, in his declaration of honour, he declared that he had never been the subject of bankruptcy proceedings (Arendt Exhibit 7).

Since this bankruptcy, Phil Neuman has been indirectly involved in a significant number of civil proceedings in the United States, a total of 48 proceedings in which his company has always been ordered to pay the amounts due.

Specifically, it appears from all the contracts between Jose Garcia, Pillo and Phil Neuman that the administrative steps taken by Phil Neuman with the CSSF and its approval were an essential condition of the Agreement. Without this condition, the Agreement between the parties could not be executed.

This requirement of good character was also included in the Settlement. This is clearly an *intuitu personae* contract and the person of the co-contractor was essential for Jose Garcia and Pillo. Indeed, it appears from the Settlement Agreement:

7. PN will receive 20% of shares in Carlisle. PN understands that since Carlisle is a company regulated by the CSSF, prior approval of the CSSF is needed before the share transfer, Agreements can be executed. T.H. Mol will handle mentioned approval process with the CSSF; this will be completed within 120 Days.

French translation :

> *"Phil Neuman] will receive 20% of the shares of [the Company]. [Phil Neuman] understands that since Carlisle is a CSSF regulated company, prior approval from the CSSF Is required before the share transfer arrangements can be executed. [Tim Mol] will handle the aforementioned approval process with the CSSF; this will be completed within 120 days."*

By way of clarification, the Agreement is the formalization of item 7 of the Settlement. Furthermore, Phil Neuman had prepared his declaration of honour prior to the signing of the Settlement and the Agreement, probably after the 2009 Contracts.

First, prior to entering into the Agreement, Phil Neuman filed a false declaration of honour.

Indeed, Phil Neuman has filled in :

| |
|---|
| **I, the undersigned,** Phil Neuman **declare on my honour:** |
| a) never having been subject or currently not being subject to bankruptcy, insolvency, moratorium, controlled management, suspension of payments, court ordered liquidation or reorganisation or any similar procedure affecting the rights of creditors generally; |
| b) never having been or currently not being a director, a manager, administrator or having a significant influence in a company, legal person or any other legal entity which has been subject or is subject to bankruptcy, insolvency, moratorium, controlled management, suspension of payments, court ordered liquidation or reorganisation or any similar procedure affecting the rights of creditors generally, or which had or has currently any significant influence on a company subject to these proceedings; |

However, it appears that Phil Neuman was the subject of a bankruptcy in his own name in 1994. In addition, several of his companies are also in default or bankruptcy, namely Geller Ltd in 1993, Dr Corporation Corp in 2003 and United National Funding LLC in 2014.

Moreover, he did so with full knowledge of the facts. Indeed, it follows from the 2009 Agreements that he will not be able to become a shareholder of the Company without the approval of the CSSF. It cannot be excluded that it is only for this reason that Phil Neuman did not take the administrative steps at the time of the 2009 Agreements.

In addition, the declaration of honour states that :

**By signing this declaration of honour, the undersigned commits to inform the CSSF without delay in case one of the elements covered by this declaration was to change in the future.**

**The undersigned recognises and accepts that if this declaration becomes or is incorrect, his/her professional propriety/repute shall be compromised.**

**By signing this declaration of honour, the undersigned commits to deal with the CSSF in an open and cooperative way and to disclose appropriately and actively any information of which the CSSF would reasonably expect notice.**

| | |
|---|---|
| Place of signature | NYC , NY |
| Date of signature | 7 August 2012 |
| Signature | |

He was therefore aware that any false statement could damage his reputation and impact his ability to become a shareholder in a regulated company.

## II. <u>IN LAW</u>

### A. Mainly: the nullity of the Agreement either for contravention of public policy, or for fraud, or for error

1. <u>Invalidity of the Agreement for contravention of public policy</u>

The Agreement is void for contravening public policy.

Indeed, in accordance with article 1133 of the Civil Code, 'a cause is unlawful when it is prohibited by law, or when it is contrary to morality or public policy', and it follows from article 1131 of the Civil Code that '*an obligation without a cause, or on a false cause, or on an unlawful cause, can have no effect*'.

A contract with an unlawful cause is thus void.

Therefore, reference should be made to sub-chapter 2.1. of CSSF circular n°18/698:

*« 5. The CSSF shall not grant authorisation to an IFM unless it has been informed of the identity of the shareholders or members, whether direct or indirect, natural or legal persons, who hold a qualifying holding and of the amount of such holding. The CSSF must be satisfied that a holder of a qualifying holding is of sufficiently good repute and is qualified to exercise its powers in such a way as to ensure the sound and prudent management of the IFM (Article 103 (1) of the Law 2010 and Article 7 (1) d) of the Law 2013).*

*6. Furthermore, it is required that the direct and indirect shareholding structure, including the persons with whom the GFI has close links, be clearly determined and organised in such a way that the CSSF can exercise its supervision without hindrance (articles 102 (2) of the 2010 Law and 7 (3) of the 2013 Law).*

*7. The notion of sound and prudent management is assessed in the light of the assessment criteria set out in Chapter 3 of the ESMA, EBA and EIOPA Joint Guidelines on the Prudential Assessment of Acquisitions and Increases of Qualifying Shareholdings in the Financial Sector (hereinafter "the Joint Guidelines").*

*The five criteria are:*

- ***the reputation/professional repute of the candidate purchaser;***
- ***the professional reputation/reputability and experience of those who will lead the IFM business;***
- *the financial soundness of the prospective purchaser;*
- *compliance with GFI prudential requirements;*
- ***The absence of any suspicion of money laundering or terrorist financing by the proposed acquirer.*** " (emphasis added).

Since the entire approval of Phil Neuman with the CSSF is based on a false declaration of honour of Phil Neuman, presented by him to Pillo and Jose Garcia before the conclusion of the Agreement, Phil Neuman was never in a position to become a shareholder in a company such as the Company which is regulated by the CSSF.

It is also clear that the facts set out above constitute fraud and it is furthermore appropriate to apply the general legal principle of "*fraus omnia corrumpit*" which prohibits any deception or disloyalty with the aim of harming or gaining profit.

The Agreement is without cause and therefore void.

2. Nullity of the Agreement for fraud

Article 1116 of the Civil Code states that:

> *"Fraud is a cause of nullity of the agreement when the manoeuvres practised by one of the parties are such that it is obvious that, without these manoeuvres, the other party would not have contracted.*
>
> *It cannot be presumed, and must be proven."*

*"Fraud consists of a discrepancy between the real will and the declared will caused by fraudulent manoeuvres.*

*It requires the meeting of two elements, one material and the other intentional. The substantive element of fraud involves deception, but it may also involve a simple lie or reticence motivated by an intention to deceive the other party. The intentional element requires that the perpetrator of the fraud has acted intentionally, not to cause harm, but to deceive the other party by causing the error or taking advantage of it. He must therefore have been aware of the circumstance which he is alleged to have killed*[1].

It turns out that this would be Phil Neuman's classic modus operandi. He contacts companies and promises to connect them with potential investors. But he has a long history in the courts, and once a shareholder in these companies, he begins to put pressure on them and profit from the dividends without actually doing the work he promised.

Phil Neuman has sold himself as a person of trust who has connections in the life insurance business. That is not the case.

In addition, Phil Neuman had completed the CSSF's declaration of honour, after the signing of the 2009 Contracts and before the signing of the Settlement and the Agreement.

He was thus aware that the essential requirement of his good character was not met at the time the Settlement and the Agreement were entered into. It is clear from Phil Neuman's good character statement that he lied to Pillo and Jose Garcia, if not failed to tell the truth to Jose Garcia and Pillo.

It is settled case-law that '*Fraud is a cause of nullity of the agreement when the manoeuvres practised by one of the parties are such that it is obvious that without these manoeuvres the other party would not have contracted. Lies and reticence are assimilated to manoeuvres properly so called*[2].

Indeed, Jose Garcia and Pillo would never have entered into the 2009 Contracts, the Settlement or the Agreement with Phil Neuman, had they known of his personal bankruptcy, particularly because it could prove fatal to the Company and its reputation.

Furthermore, Phil Neuman claimed to have a portfolio of investors to report to the Company. This is also not true. Phil Neuman also has no professional qualifications in this area.

The material and moral elements of fraud are therefore given.

The claim for nullity of the Agreement on the grounds of fraud by Jose Garcia and the company Pillo is therefore justified and well-founded.

---

[1] Court of Appeal 16 December 2015, Pas. 37, p.835.
[2] Court of Appeal 7 February 2007, Pas.33 p.397.

3. Nullity of the Agreement for error

If, by impossibility, Your Court would hold that Phil Neuman's lie and/or reticence at the time of the conclusion of the Settlement and the Agreement does not constitute fraud, it is appropriate to hold that an error was committed regarding Phil Neuman.

According to Article 1109 of the Civil Code "*There is no valid consent if the consent was given only by mistake or if it was extorted by violence or surprised by fraud.*

Article 1110 of the Civil Code provides that:

*"Error is a cause of nullity of the agreement only when it relates to the very substance of the thing which is the object of the agreement.*

*It is not a cause of nullity when it falls only on the person with whom one intends to contract, unless the consideration of that person is the principal cause of the agreement.*

It is obvious that the person of the co-contractor and his good character was an essential condition of the Agreement. This is evident from the non-execution of the 2009 Contracts as the approval process was not undertaken by Phil Neuman. The shares of the Company and the shares of the General Partner were never transferred to Phil Neuman.

In any event, Jose Garcia legitimately believed that he was contracting with a reputable and experienced life insurance professional. This is evident from the initial contract dated November 24, 2009, where cooperation and active research were the key terms of the relationship between Jose Garcia and Phil Neuman.

Jose Garcia was not aware at the time of entering into the 2009 Contracts or the Agreement that Phil Neuman was the subject of a personal bankruptcy in the United States, and has a total of 48 judgments against him on his account.

Furthermore, at the time of the conclusion of the 2009 Contracts, Jose Garcia believed that he was dealing with a person with a certain experience and a portfolio of clients who invest in life insurance. This turned out to be false. Phil Neuman is simply not the person he claimed to be. In fact, Phil Neuman never worked to advance the Company. The only thing he was interested in was cashing in on the dividends paid out by the Company.

However, at the time of the signing of the 2009 Contracts and the Agreement, Jose Garcia legitimately believed that he had a new and honourable partner who would help him move the Company forward. Phil Neuman is therefore mistaken.

In any event, the 2009 Contracts, the Settlement and the Agreement are all *intuitu personae* contracts. Jose Garcia and Pillo had some belief in Phil Neuman's assertion. This is clear from the consideration of one symbolic euro. The person of the co-contractor was therefore important to Jose Garcia. He agreed to give half of the Company for free at the time of the 2009 Contracts and 20% at the time of the Agreement for the Progress of the Company.

In this case, had Pillo known at the time of entering into the Agreement that Phil Neuman is not a trustworthy person, that he has already filed for personal bankruptcy, and that he does not plan to work towards the growth of the Company, it would never have entered into the Agreement with Phil Neuman.

If the court does not accept the nullity of the Agreement on the grounds of violation of public policy or fraud, then the Agreement should be declared null and void on the grounds of error in accordance with Article 1109 of the Civil Code.

4. <u>Effects of the nullity of the Agreement</u>

a. *As for nullity for contravening public policy*

The consequence for contravening public policy is the absolute nullity of the Agreement.

b. *As to nullity on the grounds of fraud/error*

It was only in 2021 that Pillo realised that she was dealing with a person who had lied to the CSSF. In case of error or fraud, the 5-year statute of limitations only runs from the day they were discovered (Article 1304 of the Civil Code). Pillo thus acts within the time limits.

Therefore, the sanction for fraud, if not for error as developed above, is the nullity of the Agreement.

c. *Legal consequences of nullity for the parties involved*

Each party must therefore return to the other what it has received in performance of the cancelled contract.

It follows that Phil Neuman must reimburse Pillo for (i) 22,280 shares of Carlisle Management Company S.C.A. for which he is listed in the shareholder register and (ii) the proceeds of the sale of 2,520 shares by Phil Neuman to CAV, i.e. 6,909,937.50 USD.

Pillo has to pay back 1 EUR to Phil Neuman.

It is therefore appropriate to apply the set-off between Phil Neuman's claim and Pillo's claim on the basis of Article 1289 of the Civil Code and to order Phil Neuman to pay EUR 5,866,846.88 (resulting from the subtraction of EUR 1 from the amount of USD 6,909,937.50 (provisionally evaluated at EUR 5,866,847.88 with an exchange rate of USD 1 = EUR 0.85)).

The dividends received by Phil Neuman in recent years, namely EUR 6,718,884.00, should also be ordered to be repaid.

**B. In the alternative: judicial resolution of the Agreement**

In the alternative, it is appropriate to retain the judicial resolution of the Agreement.

In accordance with Article 1184 of the Civil Code :

> *"The resolutory condition is always implied in synallagmatic contracts, in the event that one of the two parties fails to fulfil his commitment.*
>
> *In such a case, the contract is not dissolved by operation of law. The party to whom the obligation has not been performed has the choice either to force the other party to perform the agreement, where this is possible, or to ask for its termination with damages.*
>
> *The resolution must be requested in court, and the defendant may be granted a delay depending on the circumstances.*

It is clear from the above that Phil Neuman did not receive the shares of the Company for a symbolic euro and without any other consideration. Indeed, the latter was to participate in the development of the Company and to further the Company.

In the November 24, 2009 contract, it is clearly stated that

*"Neuman and Garcia will devote their best efforts, on a full time basis, to the Company [the General Partner and the Company] and the business thereof with the objective of growing the business and the profits derived therefrom including but not limited to, taking an official management role in the business, performing business development functions, actively finding investors (in cash or in kind) for the long term growth fund, and eventually bringing in additional business opportunities to the Company.*

French translation :

"*Neuman and Garcia will devote their best efforts, on a full-time basis, to the Company [the General Partner and the Company] and its business with the goal of growing the business and the benefits thereof, including, but not limited to, assuming a formal management role in the business, performing business development functions, actively finding investors (in cash or in-kind) for the long-term growth fund and potentially bringing additional business opportunities to the Company.*"

However, he never invested in the growth of the Company.

Despite several relaunches by Jose Garcia, Phil Neuman did not participate in the development of the Company. The only thing that interested him was to collect dividends while his partner Jose Garcia had to inject 1 million EUR in the Company.

Furthermore, Phil Neuman did not move to Luxembourg as agreed between the parties in the Settlement in order to ensure the proper management of the Company.

Consequently, Phil Neuman has not fulfilled his contractual obligations and it is appropriate to retain the judicial resolution of the Agreement.

The effects of judicial resolution are the same as those of nullity described above.

### C. Procedural indemnity

In view of the foregoing, Pillo requests that Phil Neuman be ordered to pay him procedural damages of EUR 100,000, on the basis of Article 240 of the New Code of Civil Procedure, whereas it would be unfair to leave him to bear the entirety of the costs not included in the costs.

## TO THESE CAUSES

To see the defendants receive the present application in its form;

on the merits, to declare it well-founded and justified;

primarily, declare the March 22, 2013 agreement between Phil Neuman and Pillo Portsmouth Holding Company, LLC void;

in the alternative, order the judicial resolution of the March 22, 2013 agreement between Phil Neuman and Pillo Portsmouth Holding Company, LLC ;

therefore :

order Phil Neuman to reimburse Pillo Portsmouth Holding Company, LLC for (i) the 22,280 shares of Carlisle Management Company S.C.A. stock and (ii) the proceeds from the sale of the 2,520 shares by Phil Neuman to Carlisle Acquisition Vehicle, namely $6,909,937.50

order Pillo Portsmouth Holding Company, LLC to reimburse Phil Neuman EUR 1;

declare that the claim of Pillo Portsmouth Holding Company, LLC of USD 6,909,937.50 and the claim of Phil Neuman of EUR 1 should be set off;

order Phil Neuman to pay EUR 5,866,846.88 (resulting from the subtraction of EUR 1 from the amount of USD 6,909,937.50 (provisionally evaluated at EUR 5,866,847.88 with an exchange rate of USD 1 = EUR 0.85));

order Phil Neuman to pay EUR 6,718,884.00 received from Carlisle Management Company, S.C.A. in terms of dividends, to Pillo Portsmouth Holding Company;

declare the judgment to be common to the party Carlisle Management Company S.C.A. ;

order Phil Neuman to pay all costs and expenses of the proceedings, with an exception for the benefit of the lawyer appearing before the Court who claims to have advanced them;

order Phil Neuman to pay procedural damages in the amount of EUR 100,000 to Pillo Portsmouth Holding Company, LLC on the basis of Article 240 of the New Code of Civil Procedure, since it would be unfair to leave the costs incurred by the plaintiffs that are not included in the costs of the proceedings, such as attorney's fees, to be borne solely by them;

to order the provisional execution of the judgment to intervene notwithstanding the appeal and without security;

reserve to the plaintiffs all other rights, dues, means and actions.

In witness whereof and whereas the party summoned sub 1) resides professionaly in the United States of America, I have sent the latter two copies of my writ together with a translation thereof into English, by registered letter with acknowledgement of receipt, to the receiving agency with territorial jurisdiction:

***ABC Legal Services***
***633 Yesler Way***
***Seattle, WA 98104***
***USA***

so that this writ may be served or notified in accordance with the Convention on the service in the Member States of judicial and extrajudicial documents in civil or commercial matters, signed in the Hague on 15 November 1965, and in so far as necessary, I have sent the latter a copy of the writ and said document with a translation thereof into English, by registered letter with acknowledgement of receipt, to this recipient.

COST

```
Duties:  180.00
Travel:   20.00
Research: 14,40
Stamp:    76.00
Reg:      12.00
VAT:      36.45
         ------
TOTAL:   338,85

Copies:   72.00
VAT:      24.48
Postage:  36.50
         ------
TOTAL:   459,53
```

## LIEU DE SIGNIFICATION

Copie(s) de l'acte, ainsi que copie(s) des présentes ont été remises par l'huissier de justice soussigné au destinataire de l'acte, respectivement pour le destinataire de l'acte, selon les déclarations recueillies et dans les conditions détaillées ci-dessous:

- [ ] en son domicile
- [x] en son siège social
- [ ] en son domicile élu
- [ ] en sa résidence principale
- [ ] ............

## MODALITES DE REMISE D'ACTE

Conformément à l'article 155 du Nouveau Code de Procédure Civile ①

Destinataire de l'acte

Exp: Etude CALVO-SCHAAL-Huissiers de Justice - B.P. 2625 L-1026 LUXEMBOURG

**CARLISLE MANAGEMENT COMPANY S.C.A.**
**société en commandite par actions**
**9, rue Sainte-Zithe**
**L-2763 LUXEMBOURG**
(A68652) 1 octobre 2021

VÉRIFIÉ LE 01 OCT. 2021

①

## SIGNIFICATION A PERSONNE

*Signification à personne*

- [ ] en y parlant à sa personne, ainsi déclarée, qui accepte la copie de l'acte
- [x] en y parlant à Monsieur LAURENAN Jiremy, employé
ainsi déclaré(e) qui accepte la copie de l'acte et qui affirme être habilité(e) à la recevoir.

## SIGNIFICATION A DOMICILE, SIEGE SOCIAL OU AUTRE

*Signification à domicile, siège, résidence principale, domicile élu et/ou autre*

Attendu que l'huissier de justice soussigné n'a pu signifier l'acte à personne, la signification a été faite par la remise d'une copie de l'acte à

............ étant ............

demeurant à [ ] la même adresse [ ] ............

ainsi déclaré(e) qui accepte la remise de la copie de l'acte et qui a donné récépissé. Une copie de l'acte a été remise sous enveloppe fermée à la susdite personne et une copie de l'acte a été laissée sur les lieux sous enveloppe fermée.

## SIGNIFICATION A DOMICILE, SIEGE SOCIAL OU AUTRE

Attendu que l'huissier de justice soussigné n'a pas pu signifier l'acte dans les formes prévues par les alinéas 2 à 5 de l'article 155 du Nouveau Code de Procédure Civile, étant donné que:

- [ ] personne, respectivement personne ayant qualité de recevoir copie de l'acte, n'a pu être trouvé sur les lieux,
- [ ] la personne présente a refusé l'acceptation de l'acte dans les conditions requises par la Loi,
- [ ] la personne présente était la partie requérante,
- [ ] ............

une copie de l'acte a été laissée sur les lieux sous enveloppe fermée et une autre copie est envoyée par la voie postale dans le délai de la loi.

La vérification d'adresse a été effectuée par obtention d'informations:

- [ ] auprès du registre national des personnes physiques (RNPP)
- [ ] auprès du registre de commerce
- [ ] auprès d'une personne trouvée sur les lieux
- [ ] ............
- [ ] Le nom figure sur une sonnette, sur une boîte aux lettres

Informations complémentaires:

Les inscriptions et les mentions écrites derrière une case côchée, celles écrites dans les cellules munies d'au moins une case côchée, ainsi que celles contenues dans les cellules numérotées ① sont à considérer.

Les inscriptions écrites directement derrière une case non côchée, sont réputées non écrites. Si une enveloppe fermée est laissée sur les lieux, celle-ci porte l'indication des nom, prénom, qualité et adresse du destinataire et le cachet de l'huissier de justice apposé sur la fermeture du pli. La présente fait partie intégrante de l'acte signifié. ①




Récépissé

[signature]

①

Date et Signature de l'huissier de justice

04/10/2021

[signature]

①